**FIREMAN'S FUND INSURANCE CO., a California corporation, Plaintiff and Counterdefendant,**

v.

**NATIONAL BANK FOR COOPERATIVES, as successor-in-interest to the Texas Bank for Cooperatives, Defendant and Counterdefendant.**

**And Intervening Plaintiffs and Counterdefendants.**

**No. C 92–2667 BAC.**

United States District Court, N.D. California.

April 1, 1994.

Paul E.B. Glad, Michael A. Barnes, Sonnenschein, Nath & Rosenthal, San Francisco, CA, for plaintiff.

James D. Rendleman, Hines & Rendleman, Napa, CA, Paul F. Miller, Lakewood, CO, for defendant.

David E. Bunim, Robert C. Nicholas, Haas & Najarian, San Francisco, CA, Mark Bonino, Ropers, Majeski, Kohn, Bentley, Wagner & Kane, Redwood City, CA, for intervenors.

## ORDER

CAULFIELD, District Judge.

### INTRODUCTION

The following motions are before the court: (1) Fireman's Fund's motion for summary judgment on its complaint and partial summary judgment on CoBank's counterclaim; (2) Federal Insurance Company's motion for summary judgment on its complaint and partial summary judgment on CoBank's counterclaim; (3) Interstate's motion for summary

judgment; (4) CoBank's motion for partial summary judgment against Fireman's Fund.[1]

For the reasons explained below: (1) Fireman's Fund's, Federal's, and Interstate's motions are GRANTED; and (2) CoBank's motion is DENIED.

## BACKGROUND

Fireman's Fund commenced this action against National Bank for Cooperatives, successor-in-interest to the Texas Bank for Cooperatives (hereinafter "CoBank"), seeking declaratory relief to determine whether it is obligated to pay an arbitration award in favor of CoBank against its policyholder, a dissolved corporation known as XLS, Inc., the successor-in-interest to Lawrence Systems, Inc. Three insurance companies intervened. Those companies are Interstate, National Union, and Federal. CoBank filed a counterclaim.

In 1986, Lawrence Systems entered a Certified Inventory Control Service agreement ("Agreement") with Aldus Marketing Association and CoBank.[2] The Agreement required Lawrence to bond the fidelity and diligence of Aldus employees who issued certificates to CoBank certifying the quantity of certain inventory on Aldus's premises or otherwise under Aldus's control. The Agreement also obligated Lawrence to compensate CoBank for losses not to exceed $5,000,000 sustained as a result of CoBank's reasonable reliance upon a material inaccurate representation in the last outstanding certificate.

The Agreement required CoBank to furnish Lawrence with written instructions pertaining to the issuance of Inventory Certificates. The Agreement also obligated CoBank to use reasonably prudent efforts to liquidate the available collateral securing Aldus's loans, with proceeds of such a liquidation to be applied directly to the collateralized loans, before making or prosecuting any claims against Lawrence. By amendment dated June 1, 1987, Lawrence's bonding obligation under the Agreement was increased to a maximum of $10,000,000.

The certificates issued by Lawrence to CoBank pursuant to the Agreement were issued weekly and all certificates expressly canceled and superseded the previous certificate issued.

On January 13, 1992, Paul F. Miller, counsel for CoBank, wrote to James L. Jennings, President of Lawrence. His letter demanded $10,000,000 from Lawrence pursuant to the Agreement. In the letter, Mr. Miller stated that CoBank had:

> [s]uffered an Actual Loss as defined by the above agreement in the amount of $16,-634,184.00. This loss resulted from reliance upon misrepresentations of both the quantity and value of inventory as reported on the Inventory Certificates submitted to the [Texas Bank for Cooperatives] by Mr. John C. Young.

> Illustrative are the misrepresentations on Inventory Certificates numbered 1366, 1377, and 1399. Mr. Young reported the value of the peanuts at $.55 per pound on each certificate with the exception of certificate number 1366 wherein he reported the value of the peanuts in the Memphis, Texas warehouse at $.40 per pound. The proper and correct value as determined from Line P ASCS form 1007 is $.30 per pound, with the results being a misrepresentation of $534,335.00, $930,300.00, and $875,185.00 respectively.

> These sums are deemed material and were relied upon by the [Texas Bank for Cooperatives] when making the following extensions of credit: [seven extensions of credit totalling $11,366,053.15 are listed.]

> According to the written instructions ... accepted by Lawrence ... John C. Young, the Lawrence bonded agent, was obligated to report the value of peanuts as shown on line P of ASCS form 1007. Mr. Young failed to adhere to these instructions and

---

1. National Union has not moved for summary judgment. The parties have submitted many objections to the evidentiary submissions, including plaintiffs' objection to Mr. Miller's declarations and exhibits in their entirety because they are not sworn to in the proper manner. The court need not rule on the objections because the material objected to does not change the outcome of the motions.

2. The description of this agreement is taken from the portions of Interstate's statement of undisputed material facts which CoBank has adopted.

falsely certified to the value of the inventory. . . . Aldus Marketing Association filed a voluntary petition for bankruptcy on September 30, 1988. . . .

At the time of the petition, the outstanding advances to Aldus totalled $18,813,-656.00. The post confirmation trustee has liquidated all inventory belonging to Aldus and applied the net proceeds against the out-standing unpaid advances owed to the [Texas Bank for Cooperatives].

Allowing for all offsets and credits the unreimbursed balance owed to the [Texas Bank for Cooperatives] is thus the $16,-634,184.00 quoted above.

(Exhibit A attached to Declaration of James Jennings in Support of Fireman's Fund's Motion).

On February 20, 1993, Mr. Miller wrote another letter to Mr. Jennings. Mr. Miller stated, in part:

As you acknowledged in your response letter, the inventory certificates did not report the peanuts as instructed in the instruction letter, i.e. the peanuts were reported at some value different from the line P value. The failure of Lawrence to accurately report the value of the peanuts is an act which caused confusion and mis-understanding as to the certification of goods and which caused and continues to cause confusion and misunderstanding as the inventory control services performed by Lawrence.

The above agreement made certain representations regarding the inventory certificates that constitute representations by Lawrence. Lawrence represented that the certificates and the peanut inventory had characteristics, ingredients, uses, benefits, or quantities which it did not have or that a person has a sponsorship, approval, status, affiliation, or connection which he does not.

\* \* \* \* \* \*

Lawrence represented that the inventory control services are of a particular standard, quality, or grade when they are of another. Lawrence represented that the inventory control services could be relied upon by a lender for the purpose of inventory financing. As facts have shown, the [Texas Bank for Cooperatives] could not

and should not have relied upon the inventory control services provided by Lawrence.

\* \* \* \* \* \*

The specific complaint is that Lawrence has engaged in acts which constituted violations of § 17.46 of the Texas Business and Commerce Code, failed to report the inventory accurately, failed to follow the instructions set forth in the letter of July 26, 1986, and *failed to compensate the [Texas Bank for Cooperatives] or the Co-Bank according to paragraph 1(b)* of the inventory control agreement.

\* \* \* \* \* \*

This letter recites in detail the specific complaint of Aldus and the amount of actual damages and expenses incurred.

(Exhibit D to Jennings Declaration.)

On or about April 2, 1992, CoBank filed an arbitration demand with the American Arbitration Association ("AAA") against XLS. CoBank's demand for arbitration stated: "Nature of Dispute: Claims for Breach of Contract; Negligence; Negligent Supervision; Deceit by Bank Fraud; Unfair & Deceptive Trade Practices." (Exhibit A to Declaration of Paul Miller In Support of Co-Bank's Motion to Dismiss.) The arbitration was held in San Francisco on June 24 and June 25, 1992.

XLS informed the arbitrators that it would not appear at the hearing or be represented by counsel and XLS did not appear at the hearing. No party defended in the arbitration. The arbitration resulted in an award in favor of CoBank and against XLS for $10,-000,000 plus costs and interest. In their Award of June 30, 1992, the arbitrators made the following relevant findings and conclusions:

7. Under the terms of the July 16 agreement, Lawrence agreed to bond the fidelity and diligence of appropriate members of Aldus' staff or other agents nominated by Aldus to, among other things, (1) issue certificates to the Bank certifying the quantity of inventory on Aldus' premises or otherwise under Aldus' control and reflecting values reported by Aldus or otherwise agreed with the Bank; and (2) comply

with written instructions accepted from the Bank specifying the conditions pursuant to which Aldus could release inventory subject to the Bank's interest, and to allow no further withdrawal or other movement or physical disposition of the inventory except as specifically authorized by the Bank;

8. Under the agreement, Lawrence agreed to compensate the Bank for "actual loss" (as defined in the agreement) not to exceed five million dollars ($5,000,000) [this was later raised to ten million dollars] sustained as a result of the Bank's reasonable reliance upon a material inaccurate representation by bonded personnel on the latest certificate outstanding from time to time;

\* \* \* \* \* \*

13. In the arbitration proceeding, the claimant claimed damages for breach of contract, negligence, negligent supervision, deceit, unfair and deceptive trade practices under Texas law, and punitive damages.

14. In the period beginning July 16, 1986, and thereafter, Lawrence Warehouse Company failed to perform its obligations to provide services as specified in the contract.

15. [CoBank] suffered damages from such failure in the amount of seventeen million, seventy nine thousand, five hundred and ten dollars ($17,079,510).

16. The liability of XLS is limited to ten million dollars ($10,000,000) under the June 16, 1986, agreement, as amended, and therefore recovery of damages by the National Bank for Cooperatives against XLS, Inc. is limited to ten million dollars ($10,-000,000). Damages are hereby awarded to National Bank for Cooperatives against XLS, Inc., in the amount of ten million dollars ($10,000,000), with interest from June 30, 1992, at the current legal rate under Texas law applicable to unpaid court judgments, until paid.

17. The claimed damages for negligence, negligent supervision, and deceit are limited to, and included in, the ten million dollars ($10,000,000) set forth above. The panel finds that the damages for these claims resulted from a failure to provide the services specified in the agreement.

18. The claimant has not sustained its burden of proof to support a finding of unfair and deceptive trade practices, or to establish punitive damages;

19. Claimant is awarded against XLS, Inc., its attorney's fees and expert's fees in the aggregate amount of $330,000. Additionally, claimant is awarded against XLS, Inc., the sum of $20,300 paid by claimant for administrative fees to the American Arbitration Association, plus the sums advanced by claimant for arbitrators' fees and other costs in the amount of $12,075. Claimant is awarded interest against XLS, Inc., on the aggregate of these sums, $362,375, from June 30, 1992, at the current legal rate under Texas law applicable to unpaid court judgments, until paid.

\* \* \* \* \* \*

21. All other claims of the National Bank for Cooperatives are denied.

22. This award includes a determination of all the questions submitted to the arbitrators the decision [of] which is necessary to determine the controversy.

The arbitration award was reduced to judgment by the United States Bankruptcy Court for the Northern District of California in orders dated July 20, 1992 and August 21, 1992. (Exhibit A to Barnes Declaration in Support of Fireman's Fund's Motion, Exhibit 13 to Miller Declaration). That court was presiding over XLS's bankruptcy.

## DISCUSSION

### A. *The Summary Judgment Standard*

Federal Rule of Civil Procedure 56(c) provides for summary judgment where no genuine issue exists as to any material fact and where the moving party is entitled to judgment as a matter of law. The burden falls on the moving party to establish that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The moving party may meet this burden by presenting evidence which, if uncontradicted, would entitle it to a directed verdict at trial. Once it has done so, the burden shifts to the non-moving party to present specific facts showing that contradiction is possible. *Brit-*

ish *Airways Board v. Boeing Co.*, 585 F.2d 946, 950–952 (9th Cir.1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). It is not required, however, that the plaintiff prove the non-existence of facts to support the non-moving party's case. Summary judgment may be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552.

A party opposing summary judgment must set forth, by affidavits or other admissible evidence, specific facts demonstrating the existence of an actual issue for trial. A mere "scintilla" of evidence will not suffice; the non-moving party must show that the fact-finder could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). "If the evidence is merely colorable ... or is not significantly probative, summary judgment may be granted." *Eisenberg v. Ins. Co. of North America,* 815 F.2d 1285, 1288 (9th Cir.1987) (citing *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511). In making this determination, the court must take the non-moving party's evidence as true and all inferences are to be drawn in the light most favorable to the non-moving party. *Eisenberg,* 815 F.2d at 1289.

"The insurer bears the burden of proving that a potential claim covered by the duty to defend falls within an exclusionary clause." *Olympic Club v. Those Interested Underwriters at Lloyd's London,* 991 F.2d 497, 502 (9th Cir.1993). However, "[w]here the scope of the basic coverage itself is at issue, the insured has the burden of showing that the event is a claim within the scope of the— basic coverage." *Hartford Fire Ins. Co. v. Karavan Enterprises, Inc.,* 659 F.Supp. 1075, 1076 (N.D.Cal.1986), *accord Olympic Club,* 991 F.2d at 502–03, *Chamberlain v. Allstate Ins. Co.,* 931 F.2d 1361, 1364 (9th Cir.1991).

**3.** Fireman's Fund's complaint raises many other grounds for why its policies do not cover Co-Bank's claims, including the allegation that it was not give the opportunity to participate in the

### B. *Fireman's Fund's Motion for Summary Judgment*

Fireman's Fund was the general liability insurer of Lawrence from 1984 until 1991. It insured Lawrence under six policies:

2 95 MXP 566 38 25

2 95 MXC 800 660 58

2 95 MXX 802 248 78

2 95 MXX 802 966 98

2 98 MXX 803 745 25

2 95 MXX 804 439 50

Fireman's Fund argues that CoBank's claims were and are not covered by Fireman's Fund's policies because the claims did not allege any of the four types of injury covered by the insuring clause—property damage, bodily injury, personal injury, and advertising injury.[3] Property damage and advertising injury are the topics of most dispute.

### 1. *Property Damage*

■ The question is whether the loss suffered by CoBank constitutes "property damage" within the meaning of the policies. The court finds that it does not.

The first three Fireman's Fund policies defined "property damage" as follows:

"Property damage" means

(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or

(2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an *occurrence* during the policy period[.]

The later policies defined "property damage" as follows:

"Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property; or

arbitration and that CoBank's damage does not result from an "occurrence." Those issues, however, are not bases of Fireman's Fund's motion.

b. Loss of use of tangible property that is not physically injured.

(Reardon Declaration, Exhibits G at 5 and J at 8.)

As is apparent from Mr. Miller's correspondence with Mr. Jennings and from the arbitration award, CoBank was damaged because its loans to Aldus were uncollectible and there was inadequate collateral to secure the loans. The cause of this damage, as alleged by CoBank and found by the arbitration panel, was CoBank's reliance on inaccurate Inventory Certificates provided by Lawrence. For example, in his first letter to Mr. Jennings, Mr. Miller stated: "This loss resulted from reliance upon misrepresentations of both the quantity and value of inventory as reported on the Inventory Certificates ...," and the arbitration panel held: "The panel finds that the damages for these claims resulted from a failure to provide the services specified in the agreement."

CoBank emphasizes, however, that the peanuts at issue were not worth the values they had been assigned because they were rotten, rancid, or otherwise deteriorated. Because the peanuts were *physically* damaged, they could not be used as collateral (or were worth much less as collateral), thus impairing the loans to Aldus.[4]

Fireman's Fund argues that the loss to CoBank was a purely economic loss, not property damage covered by the policies. The court agrees. This case is directly analogous to *Safeco Ins. Co. of America v. Andrews*, 915 F.2d 500 (9th Cir.1990), in which the Ninth Circuit held that misrepresentations about the quality (and therefore value) of real property did not constitute "property damage." In *Safeco*, Andrews sold real property improved with a home to Kuehl. Kuehl sued Andrews alleging, *inter alia*, misrepresentation and negligent failure to inspect the property and inform Kuehl of de-

fects in the property. The complaint alleged failure to discover and inform Kuehl of

facts materially affecting the value or desirability of the subject real property including ... [t]hat the subject real property had a serious problem with unstable, shifting and moving earth ... defective and inadequate electrical wiring ... defective plumbing including improper drainage from the main sewer line ... [and] severe water leakage.

*Safeco*, 915 F.2d at 501. Andrews was insured by Safeco under a policy requiring it to defend Andrews (and pay damages) in suits against him "for damages because of ... property damage caused by an occurrence to which" the coverage applies. *Id.* The policy defined "property damage" as "physical injury to or destruction of tangible property, including loss of use of this property." *Safeco*, 915 F.2d at 502. Safeco brought suit against Andrews for a declaration that it owed no duty to defend because, *inter alia*, the suit did not allege "property damage" within the meaning of the policy. The court agreed with Safeco. In a passage directly applicable to this case, the Ninth Circuit stated:

Kuehl is seeking damages for Andrews's alleged negligence in failing to inspect and inform him of defects in the property and for misrepresentation "materially affecting the value or desirability" of the property. Kuehl's claims do not expose Andrews to liability for any damage to tangible property, but rather for economic loss resulting from Andrews's alleged failure to discover and disclose facts relevant to the property's value and desirability. Such harm is outside the scope of the policy. Although the defective condition of the property is an element of Kuehl's claims, the defects cannot, even when interpreting the policy broadly, be considered the *cause* of

---

**4.** CoBank did not mention such physical damage to the peanuts in its demand letters to Mr. Jennings or in its brief filed with the arbitration panel and it was not mentioned in the arbitrator's award. CoBank asserts that the arbitration award is *res judicata*. Nonetheless, for the purpose of these motions, the court assumes that the peanuts were rancid, rotten or otherwise physically deteriorated, as asserted in the Cash and Morton affidavits submitted by CoBank.

CoBank also asserts that its predecessor suffered "property damage" in that the bad loans harmed the bank, causing it to fire employees and merge with CoBank, thus constituting the loss of use of property not physically destroyed, the third definition of property damage. Mercifully, CoBank does pursue this ridiculous argument.

Kuehl's damages. The cause of the damage was Andrews's alleged misrepresentations. . . .

> *Safeco,* 915 F.2d at 502 (citation omitted).

CoBank's claims do not constitute "property damage" within the meaning of Fireman's Fund's policies for the same reasons. As CoBank alleges, Lawrence failed to report the correct value and/or quantity of the peanuts: it failed to report that the peanuts were rancid or otherwise physically damaged.[5] The cause of CoBank's injury, however, was not the defects in the peanuts but Lawrence's alleged misrepresentations regarding the peanuts. CoBank's claims did not and do not expose Lawrence to liability for any damage to tangible property, but rather for economic loss resulting from Lawrence's alleged failure to report the peanuts' correct value. Thus, CoBank does not have a claim for "property damage" within the meaning of Fireman's Fund's policies. CoBank suffered only economic loss.

Similarly, in *Fresno Economy Import Used Cars, Inc. v. United States Fidelity & Guaranty Co.,* 76 Cal.App.3d 272, 142 Cal. Rptr. 681 (5th Dist.1977), an automobile dealer brought suit against its insurer for a declaration that the insurer had to defend certain underlying suits against the dealer. In the underlying suits, the dealer was alleged to have misrepresented the physical condition of cars it had sold and leased. The dealer claimed that the underlying suits fell within the "property damage" coverage of its comprehensive general liability policy. In rejecting that claim, the court stated:

> While the damages claimed to have been suffered by the plaintiffs [in the underlying suits] relate to the automobiles sold and leased, they are predicated on the misrepresentations made by [the dealer] concerning the automobiles. There are no allegations suggesting that [the dealer's] representations caused injury or damage to the automobiles. To the contrary, the damage

was to the plaintiffs' pecuniary interest—the out-of-pocket loss caused by the fact that plaintiffs did not receive full value for the money paid for the purchase and lease of the automobiles. Such loss of anticipated value does not constitute an "injury to or destruction of tangible personal property" as defined in the policy.

*Fresno,* 76 Cal.App.3d at 279, 142 Cal.Rptr. at 685. Again, the same reasoning applies here. CoBank's loss does not constitute "property damage" within the meaning of Fireman's Fund's policies.

■ In its current papers, CoBank argues that Lawrence somehow *caused* the physical deterioration of the peanuts and thus *caused* the property damage. *See, e.g.,* CoBank's Objections to Interstate's Motion for Summary Judgment at 6 and Appendix A to CoBank's Objection to Interstate's Motion for Summary Judgment at 1, 2, and 4. CoBank claims, apparently, that Lawrence failed to inform CoBank that the peanuts were stored in such a manner that they would deteriorate. Also, CoBank has submitted affidavits by Mr. Cash and Mr. Morton (filed originally in this court) in which they declare that the peanuts and other commodities suffered physical damage. (Exhibits 14 and 15 to Miller Declaration in Support of CoBank's Objections.)[6]

There is no finding in the arbitration award, however, that even remotely suggests that Lawrence *caused* the peanuts to deteriorate; in fact, the arbitration award does not even mention there having been any physical problem with any commodity. Yet, it is on the basis of that arbitration award that CoBank seeks to recover on the insurance policies. Since nothing in the arbitration award indicates that XLS *caused* property damage or that XLS caused the loss of use of property (as opposed to merely failing accurately to report the condition or value of the peanuts), XLS's insurers cannot be liable for property damage. Similarly, nothing in CoBank's de-

---

**5.** Again, no mention of such rancidity or physical deterioration was made in the demand letters, demand for arbitration or arbitration award. The first communication to the insurers of CoBank's allegation of such physical damage was during the proceedings before this court. There is no evidence before the court that the allegation

of physical damage was ever communicated to Lawrence/XLS.

**6.** The Cash affidavit reports damaged property in at least one location (Germany) that was not covered by the Inventory Agreement.

mand letters sent to Mr. Jennings of Lawrence or in CoBank's demand for arbitration sent to the American Arbitration Association even remotely suggested that Lawrence *caused* property damage. Thus, there was no indication to anyone reading those documents that CoBank was claiming or would later claim that Lawrence caused property damage. There was therefore no duty to defend based on the potential of a claim within the property damage coverage of Fireman's Fund's policies. The duty to defend will be discussed in more detail, *infra.*

In *Rafeiro v. American Employers' Ins. Co.,* 5 Cal.App.3d 799, 85 Cal.Rptr. 701 (1st Dist.1970), a judgment creditor of a contractor brought suit against the contractor's insurer to recover under the contractor's insurance policy. The judgment the creditor had secured was for faulty workmanship and not diminution in the value of the remainder of her property. The insurance contract excluded coverage for faulty workmanship but would have covered the diminution in value of the remainder of the property. In the suit against the insurer, the creditor submitted a declaration to establish that her property had diminished in value as a result of the contractor's acts.[7] The court held:

> Plaintiff's approach misses the mark. The issue in this case is not whether the apartments in fact suffered any diminution in value within the principles discussed below, but whether the judgment, upon which plaintiff seeks to recover, represents damages of a type for which the insurer agreed to indemnify the contractor. The plaintiff is in court as a beneficiary of the contract between the contractor and the insurer, and must bring her claim—the judgment—within the terms of that contract. Her subsequent unadjudicated claims concerning the nature of her damages cannot affect the record made in the prior suit. The trial court properly rejected any conclusion based on her declaration.

*Rafeiro,* 5 Cal.App.3d at 805, 85 Cal.Rptr. at 705–06 (citations omitted). Similarly, this court is to determine whether the judgment obtained by CoBank against XLS is covered by the insurance policies. Since nothing in

the judgment indicates that XLS caused any property damage, CoBank may not recover for property damage under Fireman's Fund's policy. The Cash and Morton declarations are irrelevant to this suit. For the foregoing reasons, the court finds that CoBank's damages do not constitute "property damage" within the meaning of Fireman's Fund's policies.

### 2. *Bodily Injury*

■ In the first two Fireman's Fund policies, bodily injury is defined as "bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom." The other policies define "bodily injury" as "bodily injury, sickness or diseases sustained by a person, including death resulting from any of these at any time." CoBank has no claim for bodily injury.

### 3. *Personal Injury*

■ The first two Fireman's Fund policies define "personal injury" as follows:

> "Personal injury" means injury arising out of one or more of the following offenses committed during the policy period:
>
> (1) false arrest, detention or imprisonment, or malicious prosecution;
>
> (2) wrongful entry or eviction or other invasion of the right or private occupancy;
>
> (3) a publication or utterance
>
> (a) of a libel or slander or other defamatory or disparaging material, or
>
> (b) in violation of an individual's right of privacy;
>
> except publications or utterances in the course of or related to advertising, broadcasting, publishing or telecasting activities conducted by or on behalf of the named insured shall not be deemed personal injury.

The other policies defined personal injury in a similar manner. CoBank has no claim for personal injury.

---

7. In the underlying judgment, the court had specifically deleted a proposed finding of diminution in value. *Rafeiro,* 5 Cal.App.3d at 803, 85 Cal. Rptr. at 704. The court did not make a finding that there was no diminution in value, however.

#### 4. *Advertising Injury*

The first two Fireman's Fund policies define advertising injury as follows:

"Advertising Injury" means injury arising out of an offense committed during the policy period occurring in the course of the named insured's advertising activities, if such injury arises out of libel, slander, defamation, violation of right of privacy, piracy, unfair competition, or infringement of copyright, title or slogan.

The other Fireman's Fund policies define it as:

"Advertising injury" means injury arising out of one or more of the following offenses:

a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

b. Oral or written publication of material that violates a person's right of privacy;

c. Misappropriation of advertising ideas or style of doing business; or

d. Infringement of copyright, title or slogan.

CoBank's claims clearly do not arise out of an advertising injury caused by Lawrence. Nonetheless, CoBank argues "[h]ad Fireman's Fund not abandoned its insured, it would have discovered that ... the claim for unfair and deceptive trade practices was a claim for advertising injury as described in the insurance policies...." Objection to Fireman's Fund Motion at 16. Assuming this to be true, CoBank's claim that its loss resulted from advertising injury must fail since the arbitrators held that CoBank "has not sustained its burden of proof to support a finding of unfair and deceptive trade practices."

Additionally, CoBank did not even potentially have a claim for advertising injury so there was no duty to defend arising out of the unfair and deceptive trade practices claim. In *Keating v. National Union Fire Ins. Co.*, 995 F.2d 154 (9th Cir.1993), the Ninth Circuit addressed the meaning of "unfair competition" in coverage for advertising injury. The question was whether claims by investors against Charles Keating for securities fraud were claims for "unfair competition" within the advertising injury coverage

of certain National Union policies. The court relied on the California Supreme Court's recent decision in *Bank of the West v. Superior Court,* 2 Cal.4th 1254, 10 Cal.Rptr.2d 538, 833 P.2d 545 (1992), in holding that the claims were not for unfair competition within the meaning of the policies.

In *Bank of the West,* the California Supreme Court rejected expansive definitions of "unfair competition" and held that in policies that provide damages for unfair competition, unfair competition does *not* include claims that might be brought under the Unfair Business Practices Act, which provides only for restitution, not damages. *Id.,* 2 Cal.4th at 1271–1274, 10 Cal.Rptr.2d at 549–51, 833 P.2d at 856–59; *Keating,* 995 F.2d at 155. While not expressly limiting claims for unfair competition to ones based on the common law tort of unfair competition, the California Supreme Court intimated its approval of the majority line of cases that do limit claims of unfair competition to common law claims. *Bank of the West,* 2 Cal.4th at 1262–65, 10 Cal.Rptr.2d at 543–545, 833 P.2d at 550.

In *Keating,* the Ninth Circuit stated:

Whether the California Court would restrict liability under such policies to the exact confines of the common-law tort of unfair competition is not crucial in this case; the Court's opinion leaves no doubt that investors' claims of the type in issue in this case do not qualify as "damages" from "advertising injury" caused by "unfair competition," as those terms appear in the context of National Union's policies. *Some* substantial component of competitive injury is required.

It is not possible to characterize the claims of the investors who are suing Keating as ones for common-law unfair competition or any approximation of that tort. They are not claims for redress of competitive injury. Even if, as Keating argues, they include allegations of "palming off" of uninsured bonds as federally insured deposits, the investors' complaints are not based on injury to Keating's competitors. Any liability from those claims cannot be brought within the policies' coverage.

Keating correctly points out that *Bank of the West* did not involve a duty to defend. Nevertheless, *Bank of the West* made clear that there was not even a *potential* for coverage under National Union's policies in this case. The district court accordingly erred in ruling that National Union had a duty to defend the investors' claims as claims for "advertising injury" caused by "unfair competition." *Keating,* 995 F.2d at 155–56. CoBank's claim is not one for "unfair competition" within the meaning of Fireman's Fund's policies for the same reasons; CoBank was not a competitor of Lawrence.[8] Also for the same reasons, there was no duty to defend based on the policies' coverage of advertising injuries.

■ The California Supreme Court also held that when the policy provides coverage for advertising injury occurring "in the course of the ... insured's advertising activities," the claimant's injury must be causally related to the insured's advertising activities. *Bank of the West,* 2 Cal.4th at 1275–77, 10 Cal.Rptr.2d at 551–53, 833 P.2d at 559–61. For those policies at issue that provided that the advertising injury had to occur in the course of the insured's advertising activities, this is another, independent, reason why no coverage existed for CoBank's claims. CoBank's claims were not causally related to Lawrence's advertising activities.

■ CoBank (in both its opposition papers signed by Mr. Miller and its own moving papers signed by Jill E. Barwick of Hines & Rendleman) makes argument that there was a duty to defend because the Court of Appeal's opinion in *Bank of the West* (which was reversed by the California Supreme Court) allegedly was still good law at the time CoBank filed its demand for arbitration. CoBank is incorrect. First of all, the lower court opinion was *not* valid at the time CoBank filed for arbitration because the California Supreme Court accepted review of the case in March of 1991, the year prior to CoBank's arbitration demand. Under California Rules of Court 976(d) and 977(a), opinions superseded by a grant of review shall

not be published and opinions not ordered published may not be cited or relied upon. It therefore would have been improper to rely on the Appellate Court's decision (and it is improper to rely on it here).

■ Moreover, the Supreme Court's opinion held that *at the time of contracting,* the insured could not have had objectively reasonable expectations that the advertising injury coverage would apply to the sort of claim made. *Bank of the West,* 2 Cal.4th at 1265, 10 Cal.Rptr.2d 545, 833 P.2d at 552. Similarly, at the time of contracting, Lawrence could not reasonably have believed that claims like CoBank's would be covered as advertising injury. Furthermore, as the California Supreme Court expressly noted:

The Court of Appeal's decision in this case *stands virtually alone among published opinions* in holding that the CGL policy's standard language covers claims under a state statute prohibiting unfair business practices. The authority against coverage for such claims is overwhelming.

*Bank of the West,* 2 Cal.4th at 1262–63, 10 Cal.Rptr.2d at 543, 833 P.2d at 550 (emphasis added). There could therefore be no reasonable expectation of possible coverage based on the Court of Appeal's opinion.

C. *Additional Arguments of CoBank in Opposition to Fireman's Fund's Motion for Summary Judgment*

■ CoBank makes five additional arguments in opposition to Fireman's Fund's motion for summary judgment. The court rejects them all.

1. *Collateral Estoppel*

CoBank states:

The issues before the arbitrators included insurance coverage and the nature of the damages causing injury to the CoBank. The CoBank asserts that this award compels this Court similarly to declare the coverage issues and the nature of the damages suffered by the CoBank as already having been decided. This is essentially

---

8. CoBank asserts that it made a claim for passing off of goods or services as those of another. Assuming it did make such a claim, *Keating* clearly forecloses coverage for it because CoBank's claims are not based on injury to Lawrence's competitors.

an assertion of the doctrine of defensive collateral estoppel. . . .

(CoBank's Objection to Fireman's Fund's Motion for Summary Judgment at 9–10, *accord id.*, at 16.) The statement that the issue of insurance coverage was before the arbitrators and that they decided it is *patently false*.[9] In his brief submitted to the arbitrators, Mr. Miller stated:

> The Claimant's concern is the insurance coverages [sic] of the Respondent and the preservation of any coverages available. Without coverage these proceedings are a waste of time and money. The Respondent represents [sic] coverage under two separate policies issued by an authorized insurer having the ability to bond the Respondent. The truth of the assertion is critical to the continuation of this arbitration.

(Miller Declaration, Exhibit 6 at 3.) This statement of hope that Lawrence was covered by insurance does not mean that the issue of insurance was before the arbitrators—it was not. Moreover, the arbitrators would have been beyond their jurisdiction had they addressed the issue.[10]

CoBank also argues that collateral estoppel or *res judicata* should apply to the issue of property damage because there is causation between liability of the insured and the physical destruction of tangible property. However, Lawrence's liability in the arbitration proceeding was for failure to fulfill its contractual obligations. It is not a necessary inference from the arbitrator's decision that Lawrence *caused* property damage.[11] Moreover, Fireman's Fund was not a party to the arbitration proceedings (and could not have

been under the terms of the policy. (Exhibit G at 3 attached to Reardon Declaration)).

### 2. *Waiver*

CoBank argues that Fireman's Fund has waived its claim of non-coverage because it did not reserve any rights to deny coverage. Since Fireman's Fund did reserve its rights (and, moreover, did not defend XLS in the arbitration proceeding), waiver is not applicable.

### 3. *Contractual Liability Coverage*

CoBank argues that coverage is provided by the broad form endorsement to the "6058" policy which adds additional coverage for liability assumed in an "incidental contract," which is any contract or agreement, oral or written, relating to the conduct of the named insured's business. CoBank is incorrect.

As insurance cases uniformly hold (including those cited by CoBank), contractual liability coverage provides coverage only for the *tort* liabilities of *third parties* assumed by the insured by contract, not for *contractual* liabilities of the insured resulting from a contract with a third party. *See, International Surplus Lines Ins. Co. v. Devonshire Coverage Corp.*, 93 Cal.App.3d 601, 608–11, 155 Cal.Rptr. 870, 873–75 (2d Dist.1979), *Fireman's Fund Ins. Co. v. City of Turlock*, 170 Cal.App.3d 988, 994–95, 216 Cal.Rptr. 796, 799–800 (5th Dist.1985), *Loyola Marymount Univ. v. Hartford Accident and Indemnity Co.*, 219 Cal.App.3d 1217, 225–26, 271 Cal.Rptr. 528, 532–33 (2d Dist. 1990). The contract among Lawrence, Al-

---

**9.** Mr. Miller's continued disregard of his requirements under Rule 11 of the Federal Rules of Civil Procedure is deeply troubling.

**10.** Ironically, CoBank would necessarily lose this case were CoBank's frivolous argument regarding collateral estoppel and insurance coverage issues to be accepted. The arbitrators made no affirmative finding that CoBank's claims were covered by the insurance policies and the arbitrators held that "[a]ll other claims of the National Bank for Cooperatives are denied." If CoBank's argument that insurance coverage was at issue before the arbitrators were accepted, therefore, collateral estoppel would preclude a finding of coverage.

**11.** CoBank also makes a ridiculous argument premised on the rule that if a liability insurer, with knowledge of a ground of forfeiture or non-coverage under a policy, assumes and conducts the defense of an action brought against the insured without *disclaiming liability and giving* notice of a reservation of rights, the insurer is thereafter precluded in an action upon the policy from setting up such ground of forfeiture or non-coverage. CoBank fails to note that Fireman's Fund (1) *did* give notice of its reservation of rights and (2) did *not* assume and conduct the defense. In fact, as Mr. Miller is well-aware, *no one* assumed or conducted the defense.

dus, and CoBank was not an "incidental contract." An "incidental contract" is one "collateral to and independent of the principal agreement...." *Globe Indemnity Co. v. California*, 43 Cal.App.3d 745, 753, 118 Cal. Rptr. 75, 81 (5th Dist.1974)). The contract at issue here was the principal agreement.

■■■ Additionally, this provision is inapplicable because CoBank claims Lawrence is liable for its *own* acts, not those of a third party. An incidental contract does not cover liability the insured may incur due to its breach of a contract to perform a job in a workman-like manner. Moreover, the liability under contractual liability coverage merely extends the coverage provided directly to the insured (*e.g.*, for property damage and bodily injury) to acts by third parties for which the insured has agreed to indemnify the third party. Since CoBank does not have a claim for property damage (or any other type of injury covered in the policies), the contractual liability coverage is no help to CoBank.

### 4. Completed Operations Coverage

CoBank argues that its claims are covered by Fireman's Fund's policies' completed operations coverage, that is, coverage for liability that arises after the insured completes its work and after the work is accepted by a third party. Fireman's Fund does not dispute that it covered property damage arising out of completed operations. The problem with CoBank's argument is that CoBank does not have a claim for property damage (or any other type of covered injury). When liability arose, therefore, is irrelevant.

### 5. Dishonesty Coverage

■■ CoBank argues that it is entitled to recover as the assignee of Lawrence under the dishonesty coverage provided by Fireman's Fund's "3825" policy. CoBank is incorrect. That policy provides:

**Employee Dishonesty** is [sic] paragraph A.2 means only dishonest acts committed by an **employee,** whether identified or not, acting alone or in collusion with other persons, except you or a partner, with the manifest intent to:

(1) Cause you to sustain loss, and also

(2) Obtain financial benefit (other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment) for:

(a) the **employee;** or

(b) Any person or organization intended by the **employee** to receive that benefit.

CoBank does not have a claim within the dishonesty coverage since there is no evidence that any employee committed dishonest acts in connection with the inventory control agreement with the manifest intent to (1) cause *Lawrence* to sustain loss and (2) obtain financial benefit for the employee or another person. It is therefore irrelevant whether CoBank is the assignee of Lawrence. The arbitration award was for Lawrence's deception of CoBank, not for the deception of Lawrence by one of its employees. CoBank's claim does not come within the dishonesty coverage of Fireman's Fund's policy.

For the foregoing reasons, the court GRANTS summary judgment to Fireman's Fund on its complaint. Fireman's Fund also seeks summary judgment on those portions of CoBank's counterclaim which relate to it. Fireman's Fund seeks: (1) a ruling that it has no duty to pay the judgment because the judgment is not for property damage, bodily injury, personal injury or advertising injury, (2) a ruling that it had no duty to defend Lawrence against CoBank's claims because there is no duty to defend an action which does not seek covered damages, (3) summary judgment in its favor on those portions of CoBank's counterclaim which relate to CoBank's claims against Lawrence, and (4), as a catch-all, summary judgment on CoBank's counterclaim to the extent it relates to Fireman's Fund's handling of the CoBank–Lawrence dispute. The duty to defend is discussed more fully below. For the reasons stated above and the reasons stated below regarding the duty to defend, the court also GRANTS these motions.

### 6. Duty to Defend

■■■ CoBank vigorously asserts that there was still a duty to defend and Fireman's Fund is therefore liable for the *full amount* of CoBank's claim even if its claims

are not covered by Fireman's Fund's policies. CoBank is incorrect.[12]

■ The insurer's duty to defend is broader than its duty to indemnify. "The insurer's duty to defend is determined on the basis of the *potential* of liability as derived from facts contained in the complaint or other sources available to the insurer at the time the defense is tendered." *Allstate Ins. Co. v. Gilbert*, 852 F.2d 449, 453 (9th Cir.1988). "[T]he duty to defend is measured at the *outset* of the litigation...." *Dykstra v. Foremost Ins. Co.*, 14 Cal.App.4th 361, 17 Cal.Rptr.2d 543, 546 (4th Dist.1993) (quoting *Devin v. United Services Auto Ass'n*, 6 Cal. App.4th 1149, 1157, 8 Cal.Rptr.2d 263 (1992)). Mere speculation that the plaintiff in the underlying action will allege new facts, however, does not create a duty to defend. *Olympic Club*, 991 F.2d at 503.

Fireman's Fund incorrectly argues that CoBank has not provided evidence that CoBank received an assignment of Lawrence's rights to sue for failure to defend. Although CoBank was remiss in not citing the evidence to support its current motion, the assignment is contained in Exhibit B to Mr. Miller's Declaration in support of CoBank's opposition to Fireman's Fund's motion to enjoin later-filed actions. The assignment, however, is to no avail.

There are two independent reasons why Fireman's Fund is not liable to CoBank for failing to defend Lawrence. The first reason is that the information available at the outset of the arbitration did not reveal the potential for coverage. In the sources of information available to Fireman's Fund, CoBank never claimed or even hinted that Lawrence had *caused* property (or other covered) damage or that there was even *any* property damage.[13] CoBank's demand letters and arbitration demand revealed only that CoBank claimed that Lawrence had misrepresented the value of the inventory. That information did not reveal potential liability for *causing*

*property damage.* Thus, there was no duty to defend.

■ Assuming Fireman's Fund wrongfully failed to defend Lawrence, Fireman's Fund would still not be liable to CoBank for that failure even though CoBank received an assignment of Lawrence's rights. Fireman's Fund could not be liable for failing to defend Lawrence because Lawrence could not have been harmed by the arbitration proceedings or the entry judgment on the arbitration award against it.

Prior to the arbitration proceeding, the Bankruptcy Court entered an injunction prohibiting CoBank from seeking to satisfy any judgment resulting from the arbitration proceeding from XLS's assets or those of its creditors; enjoined CoBank from seeking a judgment against XLS's creditors or seeking to use XLS's assets to satisfy the judgment except before the Bankruptcy Court and held that the Bankruptcy Court would not honor or recognize any of the proceedings in, or results of, the arbitration. (Exhibit B attached to Declaration of Cecily Talbert in Support of Fireman's Fund's Motion).

■ Because XLS could not have been harmed in any way by the arbitration proceedings and its resulting judgment, no harm could have resulted from the failure to defend. There was therefore no breach of the duty to defend. There is a directly analogous principle in the context of claims of breach of the implied covenant of good faith and fair dealing for failing to settle insurance claims. In *Shapero v. Allstate Ins. Co.*, 14 Cal.App.3d 433, 92 Cal.Rptr. 244 (2d Dist. 1971), the Court held that there was no breach of the implied covenant when the insured had no assets that could be exposed to a judgment in excess of the policy's limits, since the purpose of the implied covenant is to protect the insured from being exposed to financial risk. There can be no breach of the implied covenant of good faith and fair deal-

12. Assuming Fireman's Fund were liable for failing to defend, its liability would be for much less than $10,000,000. Its liability would be limited to its policy limits plus attorney fees and costs. *Hogan v. Midland Nat'l Ins. Co.*, 3 Cal.3d 553, 565–66, 91 Cal.Rptr. 153, 160–61, 476 P.2d 825, 832–33 (1970). As the court held in its most

recent order, Fireman's Fund is not liable for bad faith failure to settle because its insured was judgment proof.

13. CoBank's arguments regarding the duty to defend under the advertising injury coverage are discussed (and rejected) *supra*.

ing when the insured has no stake in the outcome of the suit against it. Similarly, there can be no breach of the duty to defend when the insured has no stake in the outcome of the suit against it. Lawrence, and therefore CoBank, has no claim for failure to defend.

### D. *Interstate's Motion for Summary Judgment*

Interstate issued Commercial Umbrella Liability Policies to Lawrence from June 18, 1986 through June 18, 1988. The policies provided limits of liability of $4 million per occurrence and $4 million in the aggregate. Interstate's policies obligated it to pay all sums which the insured became legally obligated to pay as damages for "personal injury," "property damage," or "advertising liability" caused by an occurrence. Damages were also limited to those in excess of the damages covered by Fireman's Fund's underlying policies.

The definitions of "personal injury," "property damage," and "advertising injury" in Interstate's policies are not materially different from those in the Fireman's Fund policies. For the reasons stated in granting Fireman's Fund's motion for summary judgment, the court GRANTS summary judgment in favor of Interstate. Discussed below are arguments by Interstate and CoBank that pertain only to the Interstate policies.

### 1. *Tangible Property Exclusion*

■ Interstate seeks to rely on a "tangible property exclusion" which excluded coverage in certain circumstances for "loss of use of tangible property which has not been physically injured or destroyed. . . ." That exclusion is not applicable since CoBank claims that the peanuts were destroyed.

### 2. *Notice*

■ Interstate's policies required Lawrence to give Interstate notice of claims against Lawrence and to cooperate in defending claims against Lawrence. Interstate was not notified of CoBank's claims until

September 23, 1992, *after* CoBank's claim had been arbitrated and reduced to judgment. Interstate argues that is was prejudiced by not receiving notice and therefore CoBank's claims are not covered. As explained below, however, Interstate has conflicting policy provisions concerning notice, one of which was satisfied. Since conflicting provisions create ambiguities and ambiguities are construed against the insurer, Interstate is deemed to have received notice.

The policies state:

C. *Notice of Occurrence.* When an occurrence takes place which is likely to give rise to a claim under this policy, written notice thereof shall be given to the company or any of its authorized agents as soon as practicable. . . .

The insured shall give like notice of any claim made on account of such occurrence. . . .

On the front of the policy, however, it states: "[i]n the event of any loss insured by this policy you should IMMEDIATELY contact your agent or broker or wire this company collect." . CoBank argues that these two statements create ambiguities that must be interpreted against the insurer.[14]

■ As demonstrated by CoBank's exhibit 10, XLS, through its counsel, gave notice to a company called Johnson & Higgins, which *appears* to be Lawrence's agent (broker) but it is not clear whose agent it is. Johnson & Higgins provided notice to at least some of the other insurers but not to Interstate. In the letter to Johnson & Higgins, XLS's counsel stated:

We understand that you previously put National Union Fire Insurance Company on notice of the Arbitration Claim. . . . [¶ 1] Additionally, we understand that you will put Fireman's Fund on notice. . . .

No mention is made in that letter of putting Interstate on Notice. Generally, an insurance broker is the agent of the insured, not the insurer. California Insurance Code § 33

---

**14.** CoBank also states: "Interstate took great pains at concealing the identity of Johnson & Higgins as its authorized agent by (1) obliterating the Johnson & Higgins advertisement from page 1 of the insuring agreement and the Johnson & Higgins advertisement from the commercial umbrella liability cover sheet." (CoBank's Objection to Interstate's Motion at 11–12.) CoBank does not explain what it is referring to regarding concealing the identity of Johnson & Higgins.

provides: "'Insurance broker' means a person who, for compensation and on behalf of another person, transacts insurance other than life with, *but not on behalf of,* an insurer." (Emphasis added.) While this is the general rule, there are exceptions in which the "broker" is actually an agent of the insurance company. *Fraser–Yamor Agency, Inc. v. County of Del Norte,* 68 Cal.App.3d 201, 213, 137 Cal.Rptr. 118, 126 (1st Dist.1977). Neither party has addressed whether Johnson & Higgins was, in fact, an agent of Interstate. The court need not address it either.

CoBank is correct in its assertion that the policy is ambiguous regarding notice. In the policy under the heading "Notice of Occurrence," it states "[w]ritten notice thereof shall be given to the company or any of *its* authorized agents." (Emphasis added.) However, as CoBank notes, the cover of the policy states "[i]n the event of any loss insured by this policy you should IMMEDIATELY contact your agent or broker or wire this company collect." This is a clear indication that notice to the insured's agent is sufficient notice. While it is in conflict with the notice provision within the policy, ambiguities are to be interpreted against insurer. *Hollingsworth v. Commercial Union Ins. Co.,* 208 Cal.App.3d 800, 805, 256 Cal.Rptr. 357, 359 (2d Dist.1989). The conflict creates an ambiguity. Lawrence's notice to Johnson & Higgins therefore was sufficient, regardless of whether Johnson & Higgins was Lawrence's or Interstate's agent. The court need not address whether Interstate was prejudiced by its lack of notice because it is deemed to have received notice.

### 3. *Cooperation*

■ With regard to cooperation of the insured, Interstate's policies provide:

D. Assistance and Cooperation of the Insured. The insured shall be responsible for the investigation, settlement or defense of any claim made or suit brought or proceeding instituted against the insured which no underlying insurer is obligated to defend. The insured shall use due diligence and prudence to settle all such claims and suits which in the exercise of sound judgment should be settled, provid-

ed, however, that the insured shall make no settlement for any sum in excess of the retained limit without the approval of the company.

The company, although without obligation to do so, shall have the right and be given the opportunity to associate with the insured or its underlying insurers, or both, in the defense and control of any claim, suit or proceeding which involves or a appears reasonably likely to involve the company and in which event the insured, such insurers and the company shall cooperate in all things in defense of such claims, suit or proceeding.

The insured shall cooperate with the underlying insurers as required by the terms of the underlying insurance and comply with all the terms and conditions thereof. . . .

XLS's failure to defend against the claim is clearly a failure to cooperate. Moreover, assuming Interstate would otherwise be obligated to pay CoBank's claim, Interstate clearly was prejudiced by XLS's failure to cooperate since a judgment in excess of $10,000,000 was obtained against XLS despite XLS's belief that it was not liable. (Exhibit B to Declaration of James L. Jennings in Support of Fireman's Fund's Motion for Summary Judgment).

■ CoBank asserts that Interstate was not prejudiced because XLS was dissolved and had no officers, directors, employees, or stockholders and XLS was at all times represented by McCutchen, Doyle. This has no bearing on whether Interstate was prejudiced. CoBank states that McCutchen controlled the defense. CoBank's reference to McCutchen, Doyle is apparently a reference to CoBank's frequently repeated, yet always frivolous, argument that McCutchen represented Fireman's Fund in the underlying proceedings because McCutchen represented Fireman's Fund in a completely unrelated matter. Moreover, McCutchen did not defend in the arbitration proceeding and McCutchen did not represent Interstate.

CoBank also argues that there is no evidence that XLS could have cooperated in light of the fact that it was dissolved. As CoBank notes, however, McCutchen repre-

sented XLS. Although XLS (either through itself or its counsel) did not attend the arbitration of the substantive issues, it did participate in preliminary matters in the arbitration. XLS then made a decision not to defend in the substantive arbitration proceedings. All evidence points to the conclusion that XLS (through McCutchen) could have defended had it wanted to do so. Interstate was prejudiced because XLS failed to defend. The prejudice to Interstate is an independent reason why Interstate is not obligated to pay CoBank's claim.[15]

### 4. Interstate's Attack on the Arbitration Award

■ Interstate argues that the arbitration award is not supported by the evidence and that the evidence shows that CoBank was not injured at all by Lawrence's performance under the inventory agreement. The essence of Interstate's argument is that CoBank claims that $2,179,472 was recouped upon liquidation of Aldus' inventory, said amount being offset against Aldus' outstanding loans. (Exhibit "A.") The last inventory certificate issued by Lawrence, on October 14, 1988, reported inventory valued at $1,995,933. (Exhibit "C".) Since Aldus' inventory was liquidated for more than the value of the last certificate, it is apparent that Lawrence ... satisfied its bonding obligations as promised.

■ While there is much appeal to Interstate's argument that the arbitrators were wrong, Interstate fails to cite any legal authority that would permit this court to reverse the findings of fact and conclusions of law of the arbitrators. Review of arbitration awards is extremely limited. *Local Joint Executive Bd., Culinary Workers Union, Local 226 v. Riverboat Casino, Inc.*, 817 F.2d 524 (9th Cir.1987).

### 5. Conclusion Regarding Interstate's Motion

The court GRANTS Interstate's motion for summary judgment for the grounds stated with regard to Fireman's Fund's motion and because of Lawrence's failure to cooperate in its defense.

### E. Federal Insurance Company's Motion for Summary Judgment

Federal Insurance Company seeks summary judgment declaring that it has (and had) no duty to defend or indemnify Lawrence for CoBank's claim and partial summary judgment on the third counterclaim in CoBank's Amended Counterclaim and Cross–Claims for Declaratory Relief and Damages. The court GRANTS Federal's motion.

Federal issued a commercial excess umbrella policy over Fireman's Fund's policy from June 18, 1988 to June 18, 1989. Federal's policy contained both excess insurance (Coverage A) and umbrella insurance (Coverage B). Federal joins Fireman's Fund's arguments regarding Fireman's Fund's "6698" policy, of which Federal was the excess carrier.

Federal's policy covered property damage, bodily injury, personal injury, and advertising injury. For the reasons stated above, the court finds that CoBank's claim is not covered by Federal's policy and Federal had no duty to defend. Additional grounds for Federal's motion are addressed below.

Federal's policy had two types of coverage, Coverage A and Coverage B. Coverage A was an "excess follow form liability over claims made or occurrence coverage," and Coverage B was an "umbrella occurrence based liability Coverage over retained limit." Coverage A provides, in part:

> We will pay, on behalf of an insured, damages in excess of the total Limits of Liability of Underlying Insurance as stated in the Schedule of Underlying Insurance. The terms and conditions of the Schedule of Underlying Insurance are with respect to Coverage A made a party of this policy except for:
> a. any definition, term or condition, therein relating to: any duty to investigate and defend, the Limits of Liability, premi-

---

15. CoBank argues that the "First Dollar Defense" amendment to Interstate's policy provides that the insured had to cooperate only in those suits in which Interstate had a duty to defend. CoBank's argument is patently frivolous. The assistance and cooperation provisions in the First Dollar Defense amendment are in addition to, not in the place of, the other cooperation requirements.

um, cancellation, **other insurance,** our right to recover payment, Extended Reporting Periods, or

b. any renewal agreement, and any exclusion or limitation attached to this policy by endorsement or included in the Exclusions applicable under Coverage A or B of this policy.

With respect to a. and b. above, the provisions of this policy will apply.

With respect to all Scheduled Underlying Policies, the injury or damage must be caused by an **occurrence** which takes place on or after the Effective Date....

Coverage B provides, in part:

We will pay, on behalf of an **insured,** damages with respect to liability loss in excess of the Retained Limit as specified in Item 4(d) of the Declarations, or the amount payable by any **other insurance,** whichever is greater. We will pay such damages when liability is imposed on the **insured** by law or assumed by the **insured** under an **insured contract** because of **bodily injury** or **property damage** which occurs during the policy period and is caused by an **occurrence;** and we will pay such damages when liability is imposed on the **insured** by law or assumed by the **insured** under an **insured contract** because of **personal injury** or **advertising injury** to which this coverage applies, caused by an offense committed during this policy period....

Pursuant to Endorsement # 3, "property damage" is defined as:

a. physical injury to tangible property which occurs during the policy period, including the loss of use of such property resulting from it at any time; or

b. loss of use of tangible property which has NOT been physically injured or destroyed, provided such loss of use is caused by an **occurrence** during the policy period.

"Occurrence" is defined as:

a. with respect to **bodily injury** or **property damage** liability, an event, including continuous and repeated exposure to substantially the same general harmful conditions neither expected nor intended from the standpoint of the **insured**.....

With regard to notice and cooperation, the policy provides:

DUTIES IN THE EVENT OF OCCURRENCE, CLAIM OR SUIT

You MUST see to it that we and your Scheduled Underlying Insurers:

a. are notified as soon as possible of any **occurrence** which may result in a claim if the claim may involve this policy or any Scheduled Underlying Policy.

b. receive notice of the claim or suit as soon as possible.

\* \* \* \* \* \*

d. receive your full cooperation as stated in this policy or any Scheduled Underlying Policy.

The policy also had a General Professional Exclusion in Endorsement # 8:

With respect to Coverages A and B:

it is agreed that this policy does not apply; with respect to any operation(s) described below; to any claims against the **insured** arising out of any act, error, omission or mistake committed or alleged to have been committed by or on behalf of the **insured** in rendering or failing to render services or advice of a professional nature.

Description of Operation(s):

1. ALL OPERATIONS

1. *Occurrence*

 Federal argues that Lawrence's wrongful acts were not "occurrences" or "offenses" within the meaning of the policy. The arbitrators found Lawrence liable for "negligence, negligent supervision, and deceit."[16] Citing *Keating v. National Union Fire Ins. Co.,* 754 F.Supp. 1431 (C.D.Cal. 1990) as "controlling," CoBank argues that allegations that an insured corporation's officers had negligently supervised other employees who made false and misleading statements constitute allegations of "accident" within the meaning of the primary liability policy's definition of "occurrence." The district court opinion in *Keating* is far from controlling, both because it is a district court

---

**16.** In opposition to CoBank's motion, Fireman's Fund also argues that it is not liable because deceit is intentional wrongdoing and therefore

not an "occurrence" and because it is illegal to insure a party against his own intentional wrongdoing.

opinion and because it was reversed (on other grounds) and remanded by the Ninth Circuit, 995 F.2d 154, 157 (9th Cir.1993), although the Ninth Circuit did not reach the "occurrence" issue. Nonetheless, the court agrees with CoBank's analysis of the term "occurrence."

Federal relies on *Chatton v. National Union Fire Ins. Co.*, 10 Cal.App.4th 846, 860–61, 13 Cal.Rptr.2d 318 (1st Dist.1992), for the proposition that fraudulent and negligent misrepresentation do not constitute an "occurrence" because they are deemed purposeful rather than accidental and therefore are not occurrences. *Chatton*, however, specifically distinguished the district court opinion in *Keating* because in *Keating* the complaint alleged "negligent supervision," which does not require intent and therefore can qualify as an "accident." *Chatton*, 13 Cal.Rptr.2d at 328. Similarly, in *Westfield Ins. Co. v. TWT, Inc.*, 723 F.Supp. 492, 495 (N.D.Cal.1989), Judge Legge stated:

> Some of the claims against defendants arise from acts that are not necessarily intentional. Some allegations against defendants involve negligence, not intentional wrongdoing.... Negligent supervision could constitute an "occurrence" under the policy language.

The court agrees with Judge Legge's reasoning and rejects Federal's argument that CoBank's claim is not an for an "occurrence," since the arbitration award was for negligent supervision (an accident) as well as for intentional misconduct.[17]

### 2. *Professional Services Exclusion*

■ Federal argues that there is no coverage for CoBank's claim because of Endorsement number 8's exclusion of liability for claims arising out of acts, errors, omissions, or mistakes by or on behalf of the insured in rendering or failing to render services or advice of a professional nature. Federal is correct.

The arbitration panel found that "the damages for these claims resulted from a failure to provide the services specified in the agreement." Thus, the damages resulted from acts, etc., committed in Lawrence's rendering of professional services. CoBank argues that the endorsement is ambiguous. It is not. *See Hollingsworth*, 208 Cal.App.3d at 807, 256 Cal.Rptr. at 360 (professional services "generally signifies an activity done for remuneration as distinguished from a mere pastime."). Endorsement number 8 excludes any coverage that might otherwise have been afforded by Federal's policy.

### 3. *Notice*

■ Notice of CoBank's claim was not given to Federal until August 3, 1992, long after the arbitration award was issued. Federal does not pursue the legal analysis of whether the lack of notice precludes coverage and has not listed the lack of notice as one of the grounds for its motion, but the issue is deemed before the court since both parties have addressed the factual question of notice.

CoBank argues that notice to Fireman's Fund was sufficient notice to Federal under Federal's "71–66" excess follow form policy. CoBank is incorrect. Federal's policy specifically provides that the insured must notify Federal: "[The insured] MUST see to it that *we* and your Scheduled Underlying insurers: (a) are notified as soon as possible....." (emphasis added). Moreover, to the extent that CoBank otherwise has a claim within the coverage of Federal's policy, Federal clearly was prejudiced by the lack of notice since no one defended in the arbitration proceeding. The lack of notice to Federal is an additional reason why coverage is not available under its policy.

### 4. *Insured Contract*

■ CoBank counters that its claim is covered under the "insured contract" provision of Federal's coverage B. CoBank is incorrect. Moreover, assuming the insured contract provision did apply, no coverage would be available because of Endorsement number 8 [18] and the lack of notice.

---

17. Federal's counsel was remiss in failing to bring to the court's attention the portion of *Chatton* that undermines Federal's reliance on *Chatton*, particularly since CoBank failed to address it.

18. Endorsement number 8 applies not only to acts committed by the insured but to acts, etc., committed "on behalf" of the insured.

"Insured Contract" is defined as: "Any written or oral agreement entered into by the insured in the usual course of the business operations of the insured in which the insured assumes tort liability of another to pay damages because of bodily injury, personal injury, property damage, or advertising injury to a third person or organization." Lawrence did *not* assume the liability of *another* in the Inventory Agreement and the arbitration award is not for liabilities of another. The damages assumed by Lawrence and found by the arbitrators are for liability arising out of Lawrence's *own* services. The "insured contract" provision is inapplicable.

### 5. *Conclusion Regarding Federal's Motion*

For the foregoing reasons, the court GRANTS Federal's motion for summary judgment on its complaint and against Co-Bank on CoBank's third counterclaim for declaratory relief.

### F. *Cobank's Notion for Partial Summary Judgment*

CoBank moves for partial summary judgment against Fireman's Fund on its "6058" and "4878" policies. For the reasons stated above, the court DENIES CoBank's motion.

### CONCLUSION

1. Fireman's Fund's motion for summary judgment on its complaint and partial summary judgment on CoBank's counterclaim is GRANTED.

2. Federal Insurance Company's motion for summary judgment on its complaint and partial summary judgment on CoBank's counterclaim is GRANTED.

3. Interstate's motion for summary judgment is GRANTED.

4. CoBank's motion for partial summary judgment against Fireman's Fund is DENIED.

IT IS SO ORDERED.