[Civ. No. 3024. Fifth Dist. Dec. 28, 1977.]

FRESNO ECONOMY IMPORT USED CARS, INC.,
Cross-complainant and Appellant, v.
UNITED STATES FIDELITY AND GUARANTY COMPANY; INC.,
Cross-defendant and Respondent.

274

**COUNSEL**

Dominic P. Mushines and Richard A. Bellardinelli for Cross-complainant and Appellant.

McCormick, Barstow, Sheppard, Coyle & Wayte and Stephen J. Kane for Cross-defendant and Respondent.

**OPINION**

**FRANSON, J.—**

## INTRODUCTION

This is an appeal from a judgment in a consolidated trial on two cross-complaints for declaratory relief arising out of the refusal of cross-defendant (USF&G) to defend two third party lawsuits brought against the cross-complainant and appellant, Fresno Economy Import Used Cars, Inc. The third party suits are based on a sale and a lease of two automobiles by appellant to the plaintiffs in the third party suits and seek damages for negligent misrepresentations and breach of an implied warranty of fitness due to the mechanical condition and mileage of the automobiles. Appellant contends that under the terms of a comprehensive general liability policy that USF&G had a duty to defend appellant in the third party actions and to indemnify appellant should it be found liable on the causes of action contained therein.[1] To answer appellant's

---

[1]The third party actions were settled by appellant; thus, the issue is whether USF&G is liable for appellant's reasonable costs of defense and investigation and any reasonable settlement made because of USF&G's refusal of the tender of defense when the actions were filed and served on appellant.

contention, we must examine the allegations in the third party actions and the coverage provisions of the insurance policy.

ALLEGATIONS OF THE THIRD
PARTY ACTIONS

In Susan Neely v. Fresno Economy Import Used Cars, Inc., et al., there are four causes of action pertinent to this appeal.

The first cause of action alleges that the plaintiff purchased a 1969 Fiat automobile from Fresno Economy Import Used Cars, Inc., on February 17, 1973, for a total purchase price of $2,461.95. It further alleges that at the time of the sale, the odometer reading was 25,703 miles and that said defendant represented to the plaintiff that the odometer reading was correct, that the odometer had been manipulated by the defendants and the vehicle had been driven more than 75,000 miles prior to the sale. Plaintiff further alleges that she relied upon these representations concerning the odometer reading and was induced to purchase the vehicle all to her damage in the amount of $2,646.20. The charging allegations are that the acts of the defendant were "willful, deliberate, malicious, and intended to oppress and defraud plaintiff" so that plaintiff is entitled to $100,000 exemplary or punitive damages.

The third cause of action incorporates several paragraphs of the first cause of action and further alleges that the vehicle in question had a blown head gasket at the time of sale, and the defendant had represented to the plaintiff that the vehicle had no "major mechanical defects." Plaintiff alleges intentional fraud and again seeks recovery in the amount of $2,646.20 and $100,000 for exemplary damages.

The fifth cause of action incorporates several paragraphs of the first cause of action and alleges that the defendant "negligently, carelessly and recklessly failed to obtain said information and data or any information and data concerning said automobile and negligently, carelessly and recklessly made said representations, without said information and data regarding the actual mileage."

The seventh cause of action is for breach of an implied warranty of fitness; it incorporates several paragraphs of the first cause of action and

alleges that plaintiff was required to make necessary repairs on the automobile at her own expense because the defendant refused to make the repairs. Plaintiff seeks damages for the down payment and monthly payments on the purchase of the automobile and for necessary repairs in the sum of $2,646.20.

In Don G. Nicholson and Herbert D. Lawley v. Fresno Economy Import Used Cars, et al., there are two causes of action pertinent to this appeal. The first alleges that on February 19, 1973, the plaintiffs leased a 1972 Porche from the defendant, the vehicle having a total value of $9,700. It further alleged that this automobile was represented to be a new demonstration model, but that it had been involved in a collision on November 1, 1972, causing substantial damage. The plaintiffs also alleged that defendant knew that the representations were false and were made to induce both plaintiffs to lease the car and that the said representations were "willful, deliberate, malicious and intended to oppress and defraud" plaintiffs all to the plaintiffs' damage in excess of $5,000. Plaintiffs also seek $100,000 for punitive and exemplary damages.

The fourth cause of action incorporates several paragraphs of the first cause of action and further alleges that the defendants "negligently, carelessly and recklessly made said representations without ascertaining their truth" and that the representations were made regarding the condition of the automobile when the defendants were well aware that without these facts, they could not accurately state that it was a new demonstration model.

## THE INSURANCE COVERAGE

There was in effect at the time of the occurrences alleged in the third party actions insurance coverage by USF&G under a "Master Insurance Policy." The applicable coverage provision is entitled "Comprehensive General Liability Insurance" and provides:

"The Company will pay on behalf of the *Insured* all sums which the *Insured* shall become legally obligated to pay as damages because of

"A. *bodily injury* or

"B. *property damage*

"to which this insurance applies, caused by an *occurrence*, and the Company shall have the right and duty to defend any suit against the *Insured* seeking *damages* on account of such *bodily injury* or *property damage*, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements." (Original italics.)

"Property damage" is defined as "injury to or destruction of tangible property." An "occurrence" is defined as "an accident, including injurious exposure to conditions, which results, . . . in *bodily injury* or *property damage* neither expected nor intended from the standpoint of the *Insured*." (Original italics.)

## DISCUSSION

■ The question is whether the duty to defend set forth in the coverage clause applies to any of the causes of action alleged in the third party suits against appellant. Appellant contends that the causes of action for negligent misrepresentation and breach of implied warranty established a "potentiality" of liability for property damage, thereby triggering the duty to defend. As we shall explain, however, the duty to defend did not arise because the suits against appellant do not allege a possible injury to or destruction of tangible property.

Three fundamental principles have been judicially developed for determining the obligation of a liability insurer to its insured: ■ First, any ambiguities in the language of a policy are to be construed against the insurer (*Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 269 [54 Cal.Rptr. 104, 419 P.2d 168]). This rule applies to ambiguities relating to the peril insured against, the amount of liability, and the persons protected (*id.,* at p. 269, fn. 3). ■ Second, the duty to defend is broader than the obligation to indemnify. This results from the difficulty in determining whether the third party suit falls within the indemnification coverage before the suit is resolved. To solve this problem, the courts have imposed a duty to defend whenever the insurer ascertains facts which give rise to the possibility or "potential" of liability to indemnify (*id.,* at pp. 276-277). Therefore, before an insurer may

rightfully reject a tender of defense, it must investigate and evaluate the facts expressed or implied in the third party complaint as well as those which it learns from its insured and any other sources (*id.,* at p. 276). ■ Third, while the courts look to the provisions of the policy to determine the existence of a duty to defend, the fact that the contract is one of adhesion requires the court to ascertain the meaning of the contract "which the insured would reasonably expect." (*Id.,* at pp. 269-270.)

■ Applying these principles to the present case, we conclude that appellants were not entitled to a defense by USF&G. There is no uncertainty in the coverage provided. While the policy is titled "Comprehensive General Liability Insurance," the coverage is expressly limited to "bodily injury" or "property damage." This limitation is set forth by itself in bold print in the coverage paragraph.

The third party complaints set forth no facts which constitute an allegation of personal injury or property damage. While the damages claimed to have been suffered by the plaintiffs relate to the automobiles sold and leased, they are predicated on the misrepresentations made by appellant concerning the automobiles. There are no allegations suggesting that appellant's representations caused injury or damage to the automobiles. To the contrary, the damage was to the plaintiffs' pecuniary interests—the out-of-pocket loss caused by the fact that plaintiffs did not receive full value for the money paid for the purchase and lease of the automobiles. Such loss of anticipated value does not constitute an "injury to or destruction of tangible personal property" as defined in the policy.

Appellant argues that the language "Comprehensive General Liability Insurance" in the title of the policy conflicts with the "property damage" limitation in the coverage clause, thereby creating an ambiguity which must be resolved in its favor. There is no question that the "Comprehensive General Liability" designation connotes broad general protection, but for what hazard? The coverage clause defines the hazard—injury to persons and property caused by the acts of the insured. (Cf. *Gray v. Zurich Insurance Co., supra,* at p. 272.) Webster's Third New International Dictionary, unabridged, at page 467, defines the word "comprehensive" as it relates to insurance: "covering all hazards *of a given type* with the exception of individual hazards specif. excluded." (Italics added.)

Although one may criticize liability insurers who persist in labeling their policies "comprehensive" when the policies do not in fact cover all possible risks to be incurred by the insured, we nevertheless cannot accept appellant's premise that an insured may rely on the title of the policy and ignore the bold print provisions of the coverage paragraph in asserting coverage. We must assume that in purchasing an insurance policy, a reasonable person will read at least through the coverage paragraph in ascertaining the extent of his coverage.

■ It must be kept in mind that an insurer is free to select the character of the risk it will assume, and it is liable only for a loss within the terms of the policy. (39 Cal.Jur.3d, Insurance Contracts, § 238, pp. 480-482.) The coverage terms determine the extent of the insurer's liability. Thus, in *Gray v. Zurich Insurance Co., supra,* 65 Cal.2d at page 275 the court said: "We look to the nature and kind of risk covered by the policy as a limitation upon the duty to defend." In *Continental Cas. Co. v. Phoenix Constr. Co.* (1956) 46 Cal.2d 423, at page 432 [296 P.2d 801, 57 A.L.R.2d 914], it is stated: "An insurance company has the right to limit the coverage of a policy issued by it and when it has done so, the plain language of the limitation must be respected. [Citations.]"

And in *Matsuo Yoshida v. Liberty Mutual Insurance Co.* (9th Cir. 1957) 240 F.2d 824, 826-827 it is stated: "[A] court cannot and should not do violence to the plain terms of a[n] [insurance] contract by artificially creating ambiguity where none exists. In situations in which reasonable interpretation favors the insurer and any other would be strained and tenuous, no compulsion exists to torture or twist the language of the contract."

■ Appellant's reliance on certain language in *Gray v. Zurich Insurance Co., supra,* 65 Cal.2d 263 is misplaced. *Gray* involved a complaint alleging an assault. The "comprehensive personal liability" coverage clause made two broad promises: to indemnify for all damages resulting from bodily injury or property damage, and to defend any suit against the insured alleging personal injury or property damage, even if the allegations of the suit were groundless, false or fraudulent. An exclusionary clause provided that no coverage was available if the suit was based on intentional tortious conduct. The pivotal issue before the court was whether the exclusionary clause limited the insurer's duty to defend an action alleging an assault.

As previously noted, *Gray* articulated two principles to find such a duty. First, it looked to find potential coverage. It noted that pleadings are malleable and amendable; hence, there was a potentiality that the complaint could have been amended to allege negligent conduct. From this it concluded that the insurer was obligated to defend the action.

The second approach was based on a finding that the duty to defend was set forth as a primary one in the coverage clause and was not clearly conditioned upon nonintentional bodily injury. Thus, the insured could reasonably expect the insurer to defend the action and was entitled to such protection.

In sum, *Gray* involved a broad coverage clause and an unclear exclusionary clause. The issue was the effect of the exclusionary clause upon the coverage clause. However, the court made clear that a risk falling outside the scope of the general clause did not give rise to a duty to defend. (See *Gray, supra,* at p. 275.) On the other hand, in the present case we are concerned only with the coverage clause itself, which is clear and unambiguous—the scope of coverage is unequivocally limited to bodily and property injuries.

■ Appellant next argues that the coverage extends to damages resulting from a breach of an implied warranty of fitness or quality of its automobile. It refers to exclusion (a) of the policy which provides:

"This insurance does not apply: (a) to liability assumed by the Insured under any contract or agreement except an incidental contract; *but this exclusion does not apply to a warranty of fitness or quality of the named insured's products* or warranty that work performed by or on behalf of the named insured will be done in a workmanlike manner." (Original italics deleted. Court's italics added.)

We first observe the obvious: the exclusion has reference to the hazards insured against in the coverage paragraph; thus, the exclusion's warranty language must be interpreted to relate only to personal injury or property damage actions resulting from breach of warranty.

Appellant apparently concedes this, but nevertheless argues that USF&G had a duty to defend because the breach of warranty cause of action seeks compensation for repairs made to the automobiles by the plaintiffs; that the cost of repairs constitutes a "property damage" within

the terms of the policy. In the seventh cause of action of plaintiff Neely's complaint, it is alleged that Neely was required to repair the automobile at her own expense; this allegation apparently refers to the blown head gasket in the automobile at the time of the sale as alleged in the first cause of action. The complaint prays for damages of $2,646.20 for the breach of warranty. Since the purchase price of the automobile was $2,461.95, it appears that the repair cost for the head gasket was $184.25.[2]

The contention that plaintiff's cost of repairing a broken head gasket constituted "property damage" to the automobile within the intendment of the coverage clause will not prevail. From the pleadings, the reasonable inference is that the defective head gasket was the result of the normal wear and tear of the automobile, i.e., by the fact that it had been driven more than 75,000 miles rather than 25,000 miles as represented by the odometer. Thus, it cannot be said that the defective head gasket damaged plaintiff's automobile in the sense that it, itself, caused a recognizable depreciation in the value of the automobile. The true value of the automobile was fixed by the fact that it had been driven more than 75,000 miles.

Several cases demonstrate the distinction between damages resulting from the cost of repairing a defective product and damages resulting from injury to *other property* by the defective product. In *Geddes & Smith, Inc.* v. *St. Paul Mercury Indemnity Co.* (1959) 51 Cal.2d 558 [334 P.2d 881], a plaintiff contractor alleged a breach of warranty and negligence by the insured in the sale to the contractor of 760 aluminum doors to be installed in 76 new houses under construction. After installation, serious defects appeared in the doors over a period of six months. Many replacement doors had similar defects—the doors would not close, the locks would not work and a total of 2,604 doors were shipped before suitable doors were installed in the houses. Plaintiff contractor was engaged in handling, storing, repairing and removing doors for over a year. It alleged that by reason of the expenses incurred in removing, repairing and installing new doors and loss of profits it had been damaged in excess of $100,000. The defendant insurer refused to

---

[2] In its brief appellant asserts that at the settlement conference in the Nicholson case plaintiff claimed consequential damages for repairs, maintenance, insurance premiums, loss of use, interest and attorney's fees. At the settlement conference in the Neely case it is asserted that the plaintiff claimed that numerous repairs were performed on the vehicle and that the vehicle had caught fire. However, there is no indication in the record that USF&G had notice of any facts underlying these bald assertions, hence, the duty to defend cannot be based thereon.

defend under a policy covering liability imposed against the insured for "injury to or destruction of property, including the loss of use thereof, caused by accident." The policy expressly excluded injury to or destruction of goods or products sold by the insured.[3] After first concluding that the door failures were unexpected and unforeseen and, hence, the result of an accident, the court held that the cost of removing the defective doors before they could be replaced constituted "property damage" within the meaning of the coverage provision. It reasoned that the sale and installation of the defective doors substantially depreciated the value of the houses. It cited *Hauenstein* v. *Saint Paul-Mercury Indem. Co.* (1954) 242 Minn. 354 [65 N.W.2d 122] in which the Supreme Court of Minnesota held that the sale of defective plaster used to plaster a house resulted in damage to the house when the plaster shrank and cracked and had to be removed. The presence of the defective plaster on the walls and ceilings reduced the value of the building and constituted property damage. Thus, it is clear that the diminution in the market value of the houses resulting from the defective doors in *Geddes* was the key element which brought the accident within the coverage provisions.

*Geddes* also concluded that the cost of handling the defective doors and their replacements, and the loss of profits and good will did not qualify as property damages. The court pointed out that the insurer had not undertaken to insure against all breaches of contract caused by accident and that it had specifically excluded injury to or destruction of goods or products sold by the insured (the same as exclusion.(1) in the instant policy).

In *Eichler Homes, Inc.* v. *Underwriters at Lloyd's London* (1965) 238 Cal.App.2d 532 [47 Cal.Rptr. 843] the insured was in the business of building and selling homes. It was insured against all liability for damage to or destruction of property of others but the insurance did not cover claims against the insured for the cost of repairing or replacing any defective product sold by the insured. In third party suits against the insured, it was alleged that the radiant heating system in the houses had leaked and had discharged water causing structural and other damage to the houses rendering the houses untenantable. In holding there was coverage, the court noted that the plaintiffs had alleged that the market value of the homes had been substantially impaired because of the

---

[3]The policy in the present case expressly excludes coverage to property damage to the " . . . *Insured's products* arising out of such products or any part of such products." (Original italics.)

negligently installed radiant heating systems. This was an allegation of damage *entirely unrelated to the cost of repairs and replacement of the defective heating systems*; hence, it was a claim for property damage covered by the policy. (Cf. *General Insurance Company of America* v. *Gauger* (1975) 13 Wn.App. 928 [538 P.2d 563]; see also *Ritchie* v. *Anchor Casualty Co.* (1955) 135 Cal.App.2d 245 [286 P.2d 1000].)

In *Hamilton Die Cast, Inc.* v. *United States F. & G. Co.* (7th Cir. 1975) 508 F.2d 417, a customer sued the insured for an alleged failure to comply with a contract for supplying tennis racket frames. The insured had withdrawn the frames from the market because of a defective design. Plaintiff contended that there was "property damage" within the terms of a general comprehensive liability insurance policy because the finished product, the tennis rackets, were damaged by reason of the incorporation of the allegedly defective part, the frame. The court rejected this contention and stated: "We do not think that the mere inclusion of a defective component, where no physical harm to the other parts results therefrom, constitutes 'property damage' within the meaning of the policy. For example, if an automobile crash results from the failure of its defective tire, the defective component can be said to have caused 'property damage' to the finished product. If, however, some of the tires purchased by the automobile manufacturer are found to be defective and the manufacturer therefore withdraws its cars from the market, there has not been 'injury to or destruction of tangible property' [within the coverage provisions]." (*Id.,* at pp. 419-420.)

By clear analogy, the presence of a defective head gasket in an automobile at the time of the sale, in the absence of allegations suggesting that other parts of the automobile have been damaged by the defective part and thereby causing a depreciation in the market value of the automobile, will not support a finding of injury to property within the policy coverage. There must be some facts showing that a defective part or product sold by an insured to its customers caused damage to other property after the sale, apart from the cost of repairing the defective part. No such allegations or facts are present in the case before us.

■ Finally, as to appellant's reasonable expectations of coverage (*Gray* v. *Zurich Insurance Co., supra,* at pp. 269-270), there is no evidence in the record to support a finding that appellant expected coverage for liability based on a customer's cost of repairing a defective part in an

automobile after its sale or for the customer's economic loss resulting from an overpayment in the purchase price. Appellant did not contract for and did not receive products liability coverage.[4] In fact, the policy expressly excluded this coverage. *Hogan v. Midland National Ins. Co.* (1970) 3 Cal.3d 553 [91 Cal.Rptr. 153, 476 P.2d 825] speaks on this point: "Plaintiff also contends that Diehl's reasonable expectations were that the policy would cover claims for damages for negligence, breach of warranty or strict liability in tort (*Gray* v. *Zurich Insurance Co.* [citation]) and that if Midland's views as to what constitutes an accident were accepted, Diehl would have obtained nothing of value for its premium dollar. There was no evidence in the record as to the expectations of the parties and no indication that Diehl anticipated coverage for liability not attributable to accident. The basic coverage for property damage liability due to accident is common in products liability policies and the scope of such coverage has been litigated with some frequency. [Citations.] One who purchases an insurance policy against liability for property damage due to accident cannot reasonably expect to obtain coverage for consequences clearly outside the scope of the definition of accident." (*Hogan, supra,* 3 Cal.3d at p. 561.)

The judgment in favor of the respondent is affirmed.

Brown (G. A.), P. J., and Hopper, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 22, 1978.

---

[4] By "products liability" coverage, we have reference to policies designed to protect a vendor of goods against liability for loss by reason of injury to the person or property of others caused by the use of the goods. The policy usually covers hazards described as accidents arising out of the use of or the existence of any condition in or a warranty of products sold or distributed by the insured, with specified exclusions. (44 Am.Jur.2d, Insurance, § 1431, p. 294.)