[No. B166460. Second Dist., Div. Eight. July 30, 2004.]

JANET R. BLOCK, Plaintiff and Appellant, v.
GOLDEN EAGLE INSURANCE CORPORATION et al., Defendants and
Respondents.

## COUNSEL

Law Offices of James T. Hudson and James T. Hudson for Plaintiff and Appellant.

Barger & Wolen, Gregory O. Eisenreich and Jennifer S. Yu for Defendant and Respondent Golden Eagle Insurance Corporation.

Ault, Davis & Schonfeld and R. Michael Jordan for Defendant and Respondent Clarendon Insurance Company.

McCormick, Barstow, Sheppard, Wayte & Carruth, Paul J. O'Rourke, Brandon M. Fish and Constance E. Roberts for Defendant and Respondent Blue Ridge Insurance Company.

## OPINION

**RUBIN, J.**—Plaintiff Janet R. Block appeals from the summary judgment entered against her and in favor of defendants Golden Eagle Insurance Corporation (Golden Eagle), Clarendon Insurance Company (Clarendon) and Blue Ridge Insurance Company (Blue Ridge) on Block's complaint for declaratory relief, breach of contract and insurance bad faith.[1] She contends the trial court erred in granting summary judgment because the insurers had a duty to defend Block under the insurance policies at issue. We affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

We garner the following facts from the material presented in connection with the cross-summary judgment motions filed by the parties. Most of the facts are undisputed. Block owned certain real property located within the North Long Beach Redevelopment Project Area. Block's property consisted

---

[1] Collectively defendants are referred to herein as the insurers.

of two vacant lots, which sat atop an abandoned oil well (the property).[2] Pursuant to a redevelopment plan, the Redevelopment Agency of the City of Long Beach (the agency) sought to acquire the property by eminent domain. On February 23, 1999, the agency offered Block $92,000 ($46,000 per lot) as just compensation for the property. This price reflected an appraised value of $159,000 for both lots, reduced by $67,250, which was the estimated cost to remediate the environmental problems associated with the property. Block disputed the agency's assessment of fair market value and its estimate of the cost to remediate. The agency eventually increased its offer to $126,000, but Block maintained the property had a surface value of $375,000 ($187,500 per lot), plus improvements consisting of a subsurface oil well bore pipe, plus oil and mineral rights estimated at between $30,000 and $50,000, plus drilling rights estimated at between $10,000 and $20,000.

In October 1999, the agency filed an eminent domain action against Block seeking to condemn the property in fee simple. Block cross-complained. On June 25, 2001, the eminent domain action was resolved with a stipulated judgment and final order of condemnation pursuant to which Block received a total of $475,000.

Meanwhile, during the relevant time period, Block maintained property insurance on her residence, which included coverage for vacant land owned by her. Specifically, from July 24, 1990, through July 24, 1996, she was insured by Blue Ridge; from July 24, 1996, through July 24, 1997, by Clarendon; and from July 24, 1998, through July 2001, by Golden Eagle. Block believed that the agency's reduction of its offer to buy the property in an amount equal to the estimated cost to remediate environmental damages constituted a claim for "damages" by the agency against Block. Accordingly, on September 1, 1999, before the eminent domain complaint was filed, Block notified Golden Eagle of the agency's claim upon the property. On July 14, 2000, Block tendered defense of the eminent domain action to Golden Eagle. In a letter dated June 19, 2000, Golden Eagle denied the tender for the reason that the eminent domain action did not constitute "bodily injury," "property damage" or "occurrence" as those terms were defined in the policy of insurance. Block retendered the claim, and Golden Eagle denied it again on September 18, 2001.

On September 12, 2000, while still pressing Golden Eagle to accept the defense of the eminent domain action, Block tendered that defense to both Clarendon and Blue Ridge. Both refused to defend the action.

---

[2] In answers to interrogatories, Block averred that the oil well had been abandoned and capped in 1952. In a declaration filed in the eminent domain action, Block averred that, although sealed in compliance with the law, the well remained intact and could be reopened.

Block filed this action on October 7, 1999. The operative second amended complaint, in which Block named the three insurers as defendants, was filed on July 1, 2002. On September 11, 2002, Block filed motions for summary judgment against the three defendants. Each insurer filed its own motion for summary judgment or, in the alternative, summary adjudication of the fact that the insurers did not owe Block a duty to defend or indemnify.[3]

The motions were heard together on January 17, 2003. In a written tentative ruling, the trial court granted each of the insurers' motions, therefore finding Block's motion moot. At the hearing, counsel for Block principally argued that the remediation costs constituted damages, whether they took the form of outright reimbursements or reduced compensation. The insurers countered that the eminent domain action involved a determination of the fair market value of the property, and the condition of the property was simply one factor to take into account in determining the fair market value. After taking the matter under submission, the trial court issued a written ruling on January 27, 2003, in which it granted summary judgment in favor of the insurers. The trial court observed that each of the insurance policies had virtually identical provisions regarding defense and indemnification of claims or suits brought against the insured for "bodily injury" or "property damage" caused by a covered "occurrence." It rejected Block's argument that the eminent domain action constituted a claim for damages because the reduced compensation reflected the anticipated cost to remediate the property, reasoning that no governmental entity was seeking to impose cleanup costs upon Block, nor was any such agency seeking to recover from Block remediation costs expended by the agency. Since Block was not legally liable for any "damages" within the meaning of the policies, there was no duty to defend or indemnify. The trial court concluded that the eminent domain action was

---

[3] The basis of Golden Eagle's motion was that it had no duty to defend or indemnify Block because: (1) Block was never subject to a claim for damages, property damages, bodily injury or personal injury; (2) there was no triggering occurrence under the policies; (3) the policies excluded "business pursuits" from coverage; (4) the policies excluded non-insured locations; and (5) the policies contained pollution exclusions.

Blue Ridge, like Golden Eagle, maintained it had no duty to defend or indemnify Block because Block was not subject to a claim for damages; there was no "personal injury" under the policy; the policy excluded noninsured locations; and the policy excluded business pursuits. Additionally, the Blue Ridge policy included an exclusion for property damage or personal injury arising out of a material or substance containing lead, as well as costs incurred to clean up or abate such material or substance.

Similarly, Clarendon maintained that it had no duty to defend because Block had suffered no damages, there was no personal injury, the policy contained a pollution exclusion, the policy contained an owned property exclusion and the property contained a business pursuits exclusion.

In view of our conclusion that the eminent domain action does not involve a claim for property damage or personal injury (see discussion, *post*), we do not discuss all of the insurers' arguments made in the trial court or on appeal.

"neither a 'suit' or 'claim' for 'damages,' but was rather a proceeding to determine just compensation."

## STANDARD OF REVIEW

█ Summary judgment is granted when a moving party establishes the right to the entry of judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*).) The moving party "bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law. . . . There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Id.* at p. 850, fns. omitted.) Where all of the evidence presented by the plaintiff shows the existence of an element of the offense only as likely or even less likely than the nonexistence of that element, the court must grant the defendant's motion for summary judgment because a reasonable trier of fact could not find for the plaintiff in such a case. (*Id.* at p. 857.) Even where the element at issue can be proved by inferences, the inference of the existence of the element must be more likely than the inference of its nonexistence. An inference is reasonable if and only if it implies the existence of an element more likely than the nonexistence of that element. (*Ibid.*)

█ In reviewing an order granting summary judgment, we independently examine the record to determine whether triable issues of material fact exist. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 766 [107 Cal.Rptr.2d 617, 23 P.3d 1143] (*Saelzler*).) We view the evidence in the light most favorable to the party opposing the motion. (*Aguilar, supra,* 25 Cal.4th at p. 843; *Saelzler,* at p. 768.)

## DISCUSSION

*There Was No Potential Liability for Property Damage, and Thus No Duty to Defend*

Block contends the insurers had a duty to defend her in the eminent domain action. She argues that such duty arose from the fact that the agency sought to reduce the fair market value of the property by the estimated cost of remediating the environmental condition of the property. These remediation costs, she argues, constituted "damages" for which Block was "legally liable" within the meaning of the policies. We disagree.

As noted by our Supreme Court in *Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 295 [24 Cal.Rptr.2d 467, 861 P.2d 1153]

(*Montrose*), the principles governing adjudication of an insurer's duty to defend are familiar. " '[A] liability insurer owes a broad duty to defend its insured against claims that create a potential for indemnity. [Citation.] . . . "[T]he carrier must defend a suit which *potentially* seeks damages within the coverage of the policy." ([citation], italics in original.) Implicit in this rule is the principle that the duty to defend is broader than the duty to indemnify; an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded. [Citations.]' [Citation.] [¶] 'The determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy. Facts extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy. [Citation.]' [Citation.] As one Court of Appeal has put it, '[f]or an insurer, the existence of a duty to defend turns not upon the ultimate adjudication of coverage under its policy of insurance, but upon those facts known by the insurer at the inception of a third party lawsuit. [Citation.] Hence, the duty "may exist even where coverage is in doubt and ultimately does not develop." [Citation.]' [Citation.] [¶] The defense duty is a continuing one, arising on tender of defense and lasting until the underlying lawsuit is concluded [citation], or until it has been shown that there is *no* potential for coverage . . . ." (*Ibid.*)

■ An insurance policy is a contract. "Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. [Citation.] The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' [citation], controls judicial interpretation. [Citation.] Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning. [Citations.] [¶] . . . In the insurance context, we generally resolve ambiguities in favor of coverage. [Citations.] Similarly, we generally interpret the coverage clauses of insurance policies broadly, protecting the objectively reasonable expectations of the insured. [Fn. omitted.] [Citations.]" (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 821–822 [274 Cal.Rptr. 820, 799 P.2d 1253] (*AIU*); see also *Gray v. Zurich Insurance Co.* (1966) 65 Cal.2d 263, 271–272 [54 Cal.Rptr. 104, 419 P.2d 168].) Accordingly, any doubt as to whether the facts establish the existence of a duty to defend must be resolved in the insured's favor. (*Montrose, supra*, 6 Cal.4th at p. 299.)

Here, there is no dispute that the insurance policies are virtually identical in their relevant provisions. For example, Golden Eagle's policy provides, in pertinent part, as follows: "SECTION II—LIABILITY COVERAGES [¶] COVERAGE E—Personal Liability [¶] If a claim is made or a suit is brought

against an 'Insured' for *damages* because of 'bodily injury' or 'property damage' caused by an 'occurrence' to which this coverage applies, we will: [¶] 1. Pay up to our limit of liability for the damages for which the 'Insured' is legally liable. Damages include prejudgment interest awarded against the 'Insured'; and [¶] 2. Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. . . ." (Italics added.) According to the policy, "5. 'Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in: [¶] a. 'Bodily injury'; or [¶] b. 'Property damage.' [¶] 6. 'Property damage' means physical injury to, destruction of, or loss of use of tangible property." We set forth the exact language of each of the other insurers' policy provisions in the margin.[4]

The term "damage" is not defined in any of the policies. In *AIU, supra*, 51 Cal.3d 807, the issue was whether sums an insured was held obligated to pay in third party lawsuits by various government agencies seeking to compel the insured both to pay the cost of environmental remediation incurred by the agencies, as well as additional costs incurred by the insured to clean up hazardous waste on its property, were "damages" under the policies. The court in *AIU* answered this question in the affirmative.[5] (*Id.* at pp. 824–825,

---

[4] Clarendon's policy provides: "SECTION II—LIABILITY COVERAGES [¶] COVERAGE E—Personal Liability [¶] If a claim is made or a suit is brought against an 'insured' for damages because of 'bodily injury' or 'property damage' caused by an 'occurrence' to which this coverage applies, we will: [¶] 1. Pay up to our limit of liability for the damages for which the 'insured' is legally liable. Damages include prejudgment interest awarded against the 'insured'; and [¶] 2. Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. . . ." Further, "5. 'Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in: [¶] a. 'Bodily injury'; or [¶] b. 'Property damage.' [¶] 6. 'Property damage' means physical injury to, destruction of, or loss of use of tangible property."

Blue Ridge's policy provides: "SECTION II—LIABILITY COVERAGES [¶] COVERAGE E—Personal Liability [¶] If a claim is made or a suit is brought against an 'insured' for damages because of 'bodily injury' or 'property damage' caused by an 'occurrence' to which this coverage applies, we will: [¶] 1. pay up to our limit of liability for the damages for which the 'insured' is legally liable; and [¶] 2. provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. . . ." Further, "5. 'occurrence' means an accident, including exposure to conditions, which results, during the policy period, in: [¶] a. 'bodily injury'; or [¶] b. 'property damage.' [¶] 6. 'property damage' means physical injury to, destruction of, or loss of use of tangible property."

[5] In *AIU,* various governmental agencies brought suit against the insured for alleged violations of the Comprehensive Environmental Response, Compensation, and Liability Act. These suits alleged the insured was responsible for contamination at 79 different hazardous waste disposal sites, groundwater beneath the sites, aquifers beneath adjoining property, and surrounding surface waters. The suits sought injunctions to compel the insured to stop further contamination and to clean up the area around the sites, as well as reimbursement for the agencies' costs of investigating, monitoring and initiating cleanup for which the insured was allegedly responsible. (*AIU, supra*, 51 Cal.3d at pp. 815–816.) The insured held various primary and excess comprehensive general loss (CGL) policies with various insurers. Each

832, [274 Cal. Rptr. 820, 799 P.2d 1253] ["damages" includes costs of remediation and mitigation of hazardous waste sites], 840–841 ["damages" includes costs of compliance with injunctive relief].) In concluding that these sums constituted "damages," the court in *AIU* looked to Civil Code section 3281 ["Every person who suffers detriment from the unlawful act or omission of another, may recover from the person in fault a compensation therefor in money, which is called damages"] (*AIU,* at p. 825), and considered various dictionary definitions of the term "damages."[6] It observed: "Whatever their semantic differences, the statutory and dictionary definitions of 'damages' share several basic concepts. Each requires there to be 'compensation,' in 'money,' 'recovered' by a party for 'loss' or 'detriment' it has suffered through the acts of another." (*Id.* at p. 826, fns. omitted.) Applying this definition, the court held that an insured's obligation to reimburse the agencies for response costs constituted damages because such costs constituted *losses or detriment* suffered by the agencies and the insured's reimbursement constituted *monetary compensation* for such losses. (*Id.* at p. 829.) It held further that, although environmental injunctions requiring remedial and mitigative action do not readily fit into the foregoing definition of "damages" because they do not involve *monetary compensation* of a *loss or detriment,* they nevertheless "result in costs that constitute 'damages' under [the] policies[,]" because they are equivalent or alternative

policy provided coverage for sums the insured was "legally obligated" or "obligated . . . by law" to pay as a result of the insured's liability for "property damage." (*Id.* at pp. 814–815.) The insured brought suit against the insurers seeking a declaration that the CGL policies cover costs the insured may become obligated to pay as a result of the actions brought against it by the agencies. The insurers moved for summary adjudication that, as a matter of law, the CGL policies did not cover the costs of abating and cleaning up hazardous waste and reimbursing governmental agencies for their cleanup efforts. (*Id.* at p. 816.) Our Supreme Court held that there was coverage. It noted that nearly every state court to address the issue had concluded that "cleanup costs incurred under environmental statutes are covered by policies identical to those concerned here." (*Id.* at pp. 818–819.) Those courts reasoned that the costs of reimbursing third parties are plainly "damages" the insured is "legally obligated" to pay as a result of "property damage," or those phrases are ambiguous and should be resolved in favor of coverage. (*Id.* at p. 819.) Likewise, the cost of compliance with environmental injunctions was generally found to be covered because such costs fit within a broad definition of "damages" or because "a contrary holding would unreasonably make coverage hinge on the 'mere fortuity' of which recovery mechanism (injunction, reimbursement, or 'damages to natural resources') the government selects in enforcing" environmental laws. (*Ibid.*) Some federal courts, however, have ruled that cleanup costs are not covered. (*Id.* at p. 820.)

[6] "One dictionary, for example, defines 'damages' as 'the estimated reparation in money for detriment or injury sustained: compensation or satisfaction imposed by law for a wrong or injury caused by a violation of a legal right.' (Webster's New Internat. Dict. (3d ed. 1981) p. 581.) Black's Law Dictionary similarly defines 'damages' as '[a] pecuniary compensation or indemnity, which may be recovered in the courts by any person who has suffered loss, detriment, or injury, whether to his person, property, or rights, through the unlawful act or omission of another.' (Black's Law Dict. (4th ed. 1951) p. 466, col. 2.)" (*AIU, supra,* 51 Cal.3d at p. 826.) The court in *AIU* took the word "compensation" to encompass any remunerative payment made to an aggrieved party. (*Id.* at p. 826, fn. 11.)

remedies to response costs (i.e., the property owner is required to clean up the property itself, rather than reimbursing the government for its cleanup costs) and an insured would reasonably expect equal coverage for such equivalent or alternative remedies. (*Id.* at pp. 841–842.) The court in *AIU* observed, however, that costs incurred to pay for measures taken to avoid future release of hazardous waste are *not* covered under CGL policies because no property damage had yet occurred. (*Id.* at p. 843.)

■ Block's reliance on *AIU* for the proposition that the eminent domain action was a claim for damages because the agency sought to reduce the market value of the property in the amount of the estimated remediation costs, is misplaced. In *AIU*, the insured was legally obligated to *compensate* the agencies in *money* for a *loss* or *detriment*, a basic concept of "damages." (*AIU, supra*, 51 Cal.3d at p. 826.) In holding that the cost of compliance with injunctions to clean up hazardous waste was covered under the policies, the court in *AIU* noted that such costs "do not readily satisfy the statutory or dictionary definitions of 'damages.' " (*Id.* at p. 838.) It nevertheless held such costs were covered under the policies, reasoning that it was unlikely the parties to the insurance contract intended to cover reimbursement costs but not injunctive relief where the injunctive relief is incurred for exactly the same purpose as the response costs. (*Ibid.*) Here, Block was not legally obligated to *compensate* the agency in *money* as a result of any *loss* or *detriment* suffered by the agency. Nor was she legally obligated to incur any cleanup expenses, an alternate remedy to compensating the agency for its response costs. Accordingly, Block suffered no damages. As the court in *AIU* recognized, an insured could reasonably expect to be covered for having to compensate a governmental agency for response costs or, alternatively, for the costs the insured itself is compelled to incur to clean up an environmental condition on its property. We believe there is nothing in the language of the policies present here that would cause an insured reasonably to expect there was coverage against the simple diminution in the market value of its property resulting from the condition of that property, even if it were related to the environmental condition of the property.[7]

---

[7] We find further support for this conclusion in *Lick Mill Creek Apartments v. Chicago Title Ins. Co.* (1991) 231 Cal.App.3d 1654 [283 Cal.Rptr. 231] (*Lick Mill*). In that case, the plaintiff purchased property on which hazardous waste had previously been discovered and the prior owner had failed to comply with a state cleanup order. After the plaintiff incurred costs to remedy the hazardous waste condition, it sought indemnification for such expenditure from its title insurance company. The plaintiff's theory was that the policy insured against loss or damage incurred by reason of the "unmarketability" of title, the presence of hazardous waste impaired the marketability of the property and therefore the insurer was obliged to pay the cleanup costs. (*Id.* at p. 1660.) The court of appeal disagreed. Noting the distinction between marketability of title and marketability of the land, the court in *Lick Mill* concluded that the title insurance policy insured only against unmarketability of title. (*Id.* at p. 1661–1662.) "Because marketability of title and the market value of the land itself are separate and distinct,

Block's reliance on *Aerojet-General Corp. v. Transport Indemnity Co.* (1997) 17 Cal.4th 38, 56 [70 Cal.Rptr.2d 118, 948 P.2d 909] (*Aerojet*), for a contrary result is not persuasive. Relying on *AIU*, the court in *Aerojet* observed that an insurer's liability under a CGL policy "is not narrowly confined to money that the insured must give under law as compensation to third parties, but may also include money that the insured must itself *expend* in equity in order to provide relief of the same sort." (*Aerojet*, at p. 56, italics added.) Here, Block was not required to *expend* any money to third parties. On the contrary, it was the agency that was compensating Block for the taking of her property. The amount of that loss was calculated by considering the diminution in value of the property as a result of its environmental condition.

Nor would it be appropriate to treat the diminution in value of the property because of its environmental condition as a *constructive* expenditure. Black's Law Dictionary (8th ed. 2004) defines "expenditure" as: "1. The act or process of paying out; disbursement. 2. A sum paid out." (*Id.*, at p. 617, col. 2.) It defines "constructive" as: "Legally imputed; having an effect in law though not necessarily in fact. Courts usually give something a constructive effect for equitable reasons . . . ." (*Id.*, at p. 333, col. 1.) We see no reason to treat diminution in value of property because of environmental conditions as a constructive expenditure. This would essentially convert a liability policy to one that insures against a diminution in market value. Such a construction would dramatically change the nature of the insurance policies at issue here, and would not comport with the parties' reasonable expectations. (*AIU, supra,* 51 Cal.3d at p. 821.)[8]

We are also not persuaded that *Construction Protective Services, Inc. v. TIG Specialty Ins. Co.* (2002) 29 Cal.4th 189 [126 Cal.Rptr.2d 908, 57 P.3d 372] (*CPS*), is helpful to Block. She argues that *CPS* stands for the proposition that the remediation costs by which the market value of the property was reduced constituted a "setoff" claim for damages that creates a duty to defend. In that case, the issue was whether a CGL policy that obligates an insurer to defend and indemnify its insured against suits seeking damages thereby obligates the insurer to defend and indemnify the insured against a setoff claim asserted under Code of Civil Procedure section 431.70 (section 431.70); defendant in a suit for money may assert an otherwise time-barred

---

plaintiffs cannot claim coverage for the property's physical condition under this clause of the insurance policies." (*Id.* at p. 1662.) Under the reasoning of *Lick Mill*, we find that Block cannot claim coverage under the policies at issue because those policies do not insure against a reduction in the market value of the land.

[8] Interestingly, here Block argues that the abandoned oil well and associated pipeline were conditions that diminished the value of the property and thus constituted damages. In the eminent domain action, she argued these conditions enhanced the value of the land.

cross-demand for money as an affirmative defense. (*CPS*, at p. 192.)[9] Because of the procedural posture of that case—an appeal from the sustaining of a demurrer—the court in *CPS* did not resolve the issue. Observing that, for accounting purposes, a monetary recovery on a suit for damages was no different than a setoff against another debt, the court expressly declined to answer whether a setoff claim should therefore be treated as a suit for damages. Instead, it held that "CPS's complaint adequately stated a prima facie right to relief . . . . In an action based on a written contract, a plaintiff may plead the legal effect of the contract rather than its precise language. [Citation.] . . . [CPS's complaint] satisfactorily alleged (1) that the insurance policy obligated [the insurer] to defend and indemnify CPS against suits seeking damages, and (2) that under the terms of the policy, [the contractor's] setoff claim fell within the scope of that contractual obligation. Whether CPS can prove these allegations (that is, whether its interpretation of the applicable contractual language is correct in light of what we have said here) remains to be seen, but the allegations are sufficient to establish a prima facie right to relief. [The insurer] may move for judgment on the pleadings or summary judgment, raising the same arguments it raised in its demurrer, and in support of its motion it may provide the court with a copy of the insurance policy in question." (*Id.* at pp. 198–199.)

*CPS* is inapposite. First, this case comes to us after summary judgment, not after a demurrer. Accordingly, the insurance policies, the pleadings in the eminent domain action and other evidence of the sort that was not before the court in *CPS*, are in the record here. Thus, we are not faced with determining whether Block has established a prima facie case—the issue in *CPS*—but whether the evidence would allow a reasonable trier of fact to find that Block potentially suffered an *insured* loss, a condition precedent to the duty to defend. Second, there is no section 431.70 setoff claim here. Rather, Block seeks to analogize the diminution in value because of the environmental condition of the property to a setoff claim. But the two are not analogous. The setoff claim in *CPS*, like the cleanup costs and response costs in *AIU*, involved a forced money expenditure by the insured: the insured was

---

[9] In *CPS*, the insured was hired by a general contractor to provide security services at a construction site. During the course of construction, a fire broke out at the site, which caused damage to the contractor's work. When the contractor refused to pay CPS for its services, CPS brought suit against the contractor. The contractor asserted as an affirmative defense that CPS was responsible for the damages arising out of the fire and that the contractor was therefore entitled to set off the fire damages against any amount it owed CPS. CPS tendered defense of the setoff claim to its insurer, which refused the tender. After resolving the dispute with the contractor, CPS brought suit against its insurer for breach of contract and of the covenant of good faith and fair dealing. The trial court sustained the insurer's demurrer to the complaint, reasoning that an insurer does not have a duty to defend against affirmative defenses raised in response to an insured's complaint against another party. The court of appeal reversed. The Supreme Court affirmed the judgment of the court of appeal, but for different reasons. (*CPS, supra,* 29 Cal.4th at pp. 193–194.)

allegedly liable for the damage caused by the fire. As we have already discussed, Block is not liable for any money expenditure; the underlying case involved only a determination of the fair market value of the property.[10]

Also unavailing is Block's reliance on *Redevelopment Agency v. Salvation Army* (2002) 103 Cal.App.4th 755 [127 Cal.Rptr.2d 30] (*Salvation Army*), for the proposition that the estimated remediation costs constituted damages because the agency could have sued Block to clean up the property.[11] The issue in that case was whether the redevelopment agency had satisfied the legal requirements for recovery of the costs it actually incurred to remediate the environmental condition of the property. There was no issue of insurance coverage. Here, the agency did not proceed against Block under the applicable state laws authorizing reimbursements to state agencies. Accordingly, *Salvation Army* is inapposite.

We are also unpersuaded by Block's reliance on treatises for the proposition that there was a duty to defend because the reduction in value constituted a setoff claim.[12] The treatises she cites do not suggest that a reduction in

---

[10] Block relies on *Redevelopment Agency v. Thrifty Oil Co.* (1992) 4 Cal.App.4th 469 [5 Cal.Rptr.2d 687] (*Thrifty Oil*), for the proposition that remediation costs should be treated as a setoff against the fair market value of the property. That reliance is misplaced. In *Thrifty Oil*, an eminent domain case, the only issue at trial was the value of the property and the good will of the business. The property had contaminated soil as a result of its prior use as a gasoline station. Experts retained by both the city and the landowner, as well as an expert appointed by the court, agreed that the value of the property should be reduced by the cost of remediation, although they disagreed on what those actual figures should be. On appeal, the reviewing court rejected the landowner's contention that the jury's valuation was not supported by substantial evidence. It concluded that the cost of remediation was a characteristic of the property which would affect its value, and was therefore properly before the trier of fact. (*Id.* at pp. 473–474 & fn. 9.) *Thrifty Oil* was not an insurance coverage case, nor did it hold that remediation costs were analogous to a section 431.70 setoff claim.

[11] In *Salvation Army*, the defendant owned property in a redevelopment project area. In accord with the Polanco Redevelopment Act (Health & Saf. Code, § 33459 et seq.), the redevelopment agency gave the defendant notice to submit a timely proposed action plan to remediate hazardous substances on the property. When the defendant failed to do so, the agency undertook the cleanup. The agency then filed suit against the defendant for eminent domain, cost recovery under the Polanco Redevelopment Act, and declaratory relief. The agency paid into court the sum of $289,000, which represented the agreed upon $550,000 amount of just compensation, minus $260,000 for the cost of investigating and remediating the environmental conditions on the property. (*Salvation Army, supra,* 103 Cal.App.4th at pp. 761–762.) The parties settled the eminent domain portion of the action and, when the matter came on for trial, the only remaining cause of action was for recovery of costs under the Polanco Redevelopment Act. The trial court awarded the agency its costs. The court of appeal affirmed. The case had nothing to do with insurance coverage.

[12] For example, Block cites 1 Matteoni & Veit, Condemnation Practice in California (Cont.Ed.Bar 2d ed. 2003) section 4.73, page 193 (Matteoni & Veit). In that treatise, the authors observe that "[c]ontamination or the presence of hazardous materials within a condemned parcel presents procedural and substantive issues concerning valuation. . . . [¶] . . .

market value for the cost of remediation constitutes a section 431.70 setoff claim, only that the cost of remediation will be offset against the market value of the property. Moreover, in their reference to insurance coverage, they do not discuss the distinction between a property owner who is compelled to expend money to clean up and/or reimburse governmental response costs, and a property owner whose property is simply diminished in market value because of the environmental condition of the property, but is not compelled to pay out any money. By failing to discuss the difference, the secondary sources do not help us.

       Our conclusion that the policies at issue did not insure against a diminution in market value as a result of the property's environmental condition because such diminution in value does not constitute "damages" within the meaning of those policies is consistent with *Fresno Economy Import Used Cars, Inc. v. United States Fid. & Guar. Co.* (1977) 76 Cal.App.3d 272 [142 Cal.Rptr. 681] (*Fresno*), in which the court held that the diminution in the value of a product by reason of a defective part or faulty workmanship does not constitute property damage within the meaning of the standard insuring clause. In *Fresno*, the insured car dealer sought declaratory relief arising out of its insurer's refusal to defend two third party lawsuits against the insured, which sought damages for negligent misrepresentation and breach of the implied warranty of fitness as to cars purchased from the insured. The court in *Fresno* concluded that the third party complaints "set forth no facts which constitute an allegation of personal injury or property damage. . . . [T]he damage [caused by the alleged misrepresentations] was to the plaintiffs' pecuniary interests—the out-of-pocket loss caused by the fact that plaintiffs did not receive full value for the money paid for the purchase and lease of the automobiles. Such loss of anticipated value does not constitute an 'injury to or destruction of tangible personal property' as defined in the policy."[13] (*Id.* at

---

[T]here may be insurance coverage issues." (*Ibid.*) The authors recommend that, under *AIU*, insurance coverage should be investigated. (*Id.* at p. 199.) They note that, "It is often the condemnor's position, on discovery of contamination (from whatever source) affecting the property under condemnation, that the cost of cleanup should be offset against the value of the land. (See § 4.9 [Physical Nature of Property].) . . . [¶] . . . Procedurally, the property owner may seek to bifurcate or separate the contamination issue from valuation (see § 9.24 [In Limine Motions]) and, at the same time, cross-complain against third parties (see § 8.33 [Cross-Complaint])." (*Id.* at p. 193.) Matteoni & Veit further states: "Separate trials or bifurcation of issues may be desirable in an action involving toxic contamination and the alleged diminution in value resulting from remedial costs. See § 4.73. Considerations for separating the establishment of contamination from the establishment of value are: [¶] . . . [¶] If an insurance company accepts the defense of the contamination issue in a condemnation case, an insurance defense lawyer represents the property owner in what, to that lawyer, is not an action concerning value." (*Id.* at § 9.25, p. 452.)

[13] According to the policies at issue in *Fresno*, " 'property damage' " is defined as " 'injury to or destruction of tangible property.' An 'occurrence' is defined as 'an accident, including injurious exposure to conditions, which results, . . . in *bodily injury* or *property damage* neither

p. 279.) By parity of reasoning, a loss of market value attributable to the environmental condition of property does not constitute "damages" under the policies at issue.

*There Was No Potential Liability for Personal Injury, and Thus No Duty to Defend*

Block contends there was potential liability under the "personal injury" coverage in the policies. She argues that, under *Martin Marietta Corp. v. Insurance Co. of North America* (1995) 40 Cal.App.4th 1113 [47 Cal.Rptr.2d 670] (*Martin Marietta*), the cost to remediate soil and groundwater and to re-abandon the old oil well avoided potential claims by third parties, such as adjacent landowners. We find *Martin Marietta* inapplicable.

"In the world of liability insurance, personal injury coverage applies to injury which arises out of the commission of certain enumerated acts or offenses. [Citations.] Coverage thus is triggered by the offense, not the injury or damage which a plaintiff suffers." (*Fibreboard Corp. v. Hartford Accident & Indemnity Co.* (1993) 16 Cal.App.4th 492, 511 [20 Cal.Rptr.2d 376].) The offense with which we are concerned is "wrongful entry," which includes trespass claims. (*Ibid.*) In *Martin Marietta*, the insured was the subject of actions by various governmental agencies to compel it to remediate groundwater and other contamination emanating from a number of sites. The insured tendered the claim to its insurer. The insurer moved for summary adjudication on the grounds that the claims were not "because of" personal injury as that term was defined in the insurance policies, and that it therefore had no duty to defend or indemnify. (*Martin Marietta, supra,* 40 Cal.App.4th at p. 1118 [47 Cal.Rptr.2d 670].) The trial court agreed and granted summary judgment. (*Id.* at p. 1121.) The court of appeal reversed, reasoning that the claims against the insured were based in part on nuisance and trespass on lands "owned by individuals, businesses, and, perhaps, governmental entities." (*Id.* at p. 1134.) Accordingly, such claims raise a potential for coverage under language giving coverage for " 'wrongful entry' " and " 'other invasion of the right of private occupancy.' " (*Id.* at p. 1136.)

This case involves no claims that have been or might be made by others, including adjacent landowners. Accordingly, *Martin Marietta* has no application.[14] (Cf. *AIU, supra,* 51 Cal.3d at p. 843 [costs incurred to pay for

---

expected nor intended from the standpoint of the *Insured.'* " (*Fresno, supra,* 76 Cal.App.3d at p. 278, original italics.)

[14] We do not decide whether the various policies at issue here would provide coverage for claims that, for example, the abandoned oil well caused damage to third parties, including adjacent landowners. That issue is not before us and was not raised in the eminent domain action.

measures taken to avoid future release of hazardous waste are not covered under the policies because no property damage has yet occurred].)

## DISPOSITION

The judgment is affirmed. The insurers are entitled to their costs on appeal.

Cooper, P. J., and Boland, J., concurred.